In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3568

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSEPH T. NUREK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 333—**Wayne R. Andersen**, *Judge.*

ARGUED SEPTEMBER 3, 2008—DECIDED AUGUST 21, 2009

Before EASTERBROOK, *Chief Judge*, and ROVNER and
SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Joseph Nurek pleaded guilty to
receiving child pornography in violation of 18 U.S.C.
§ 2252A(a)(2)(A) and was sentenced to 240 months in
prison, the statutory maximum. On appeal Nurek chal-
lenges the district court's application of the two-level
sentencing guidelines enhancement for obstruction of
justice, *see* U.S.S.G. § 3C1.1; the government's refusal to
move for a third-point reduction in his offense level for

acceptance of responsibility, *see* U.S.S.G. § 3E1.1(b); the district court's use of the 2006 Guidelines Manual (in effect at the time of sentencing) instead of the 2003 Guidelines Manual (in effect at the time of his offense); and the overall reasonableness of his sentence. We reject these challenges and affirm.

## I. Background

Joseph Nurek has a Ph.D. in education and worked as a principal at various elementary and middle schools in Michigan and Illinois from 1984 until 2004. In March 2004 federal agents executed a search warrant at Nurek's Chicago home looking for evidence of child pornography. Nurek's computer was seized and forensic analysis revealed that he had stored thousands of downloaded images of child pornography on it. At the time, the agents were also investigating Nurek for sexually abusing three children, whom we refer to as Victims A, B, and C. The alleged abuse of Victims A and C occurred in the early 1990s in Michigan; the alleged abuse of Victim B, in contrast, was ongoing at the time of the search.

In 1991 Nurek was charged in Michigan state court with sexually abusing a student from the middle school where he was the principal; a second count alleged that Nurek distributed obscene material to the child. The Michigan investigation had initially involved two student victims, but the State proceeded on charges involving only one victim because the second child did not want to testify. (The 2004 investigation into the alleged abuse of Victims A and C involved different

children—who were by then adults—although the abuse dated from the same general time period as the Michigan prosecution.) The sexual-abuse count in the Michigan case was dismissed at the preliminary hearing after the judge held that the child's description of Nurek's conduct did not constitute "sexual contact" under Michigan law. Nurek was acquitted by a jury on the remaining charge that he distributed obscene material to a minor.

Cleared of these charges, Nurek moved to Illinois and began applying for teaching and administrative jobs at schools in and around Chicago. He did not disclose the sexual-abuse and obscenity-distribution charges involved in the Michigan prosecution. He was eventually hired as principal of a school for the developmentally disabled in Chicago and later became principal of a school for emotionally disturbed children in Arlington Heights, Illinois. In 2000 he became principal of the Chicago International Charter School, where Victim B was a student.

Victim B and his mother and siblings were living in a homeless shelter at the time. At some point the family moved to Elgin, Illinois, which was too far away for Victim B to commute to the Charter School. To enable her son to continue to attend the Charter School, Victim B's mother signed a document purporting to give Nurek temporary custody of Victim B, and in August 2003, just before the start of his seventh-grade school year, Victim B moved in with Nurek. From then until the March 2004 search, Nurek repeatedly sexually abused Victim B. When

federal agents questioned Nurek during the execution of the search warrant, however, he denied ever having molested any children. He also told the agents that the computer they seized was the only one he possessed.

Nurek was arrested and a magistrate judge eventually released him on bond. As a condition of his release, he was prohibited from having any contact with Victim B or Victim B's family. Nurek violated this order on numerous occasions: He called Victim B's family on the phone, visited them at their home, gave them several thousand dollars, had Victim B's brother over to his house, sent a personal letter to Victim B, and proposed marriage to Victim B's mother. More specifically, Nurek frequently talked to Victim B's family members on the phone and visited with them in person on several occasions. He gave Victim B's brother and mother more than $2000 each. He told Victim B's mother that he loved her and asked her to run away with him and get married so they could be "one big happy family." In his letter to Victim B, Nurek said he was sorry and that he wanted to be "a good dad to you" and that he loved Victim B "as a good father loves his son." Based on these violations of his pretrial release order, Nurek's bond was revoked and he was returned to custody.

While he was still free on bond, however, Nurek contacted Chicago police to report the unexplained presence of drugs at his home. Police responded, spoke to Nurek and his attorney, and received permission to search his garage, where Nurek said he had seen the drugs. Among other discoveries in the garage, the police found a com-

puter hard drive with holes drilled in it, sitting in about six inches of gasoline in a bucket hidden behind some shovels. Nurek told the officers he was trying to destroy tax-return information on the computer. Attempts to retrieve information from the computer were unsuccessful.

Nurek was indicted on seven counts of receiving child pornography and one count of possessing child pornography. A superseding indictment later added two counts of transporting a minor across state lines to engage in sexual conduct. One of these counts involved conduct against Victim B; Nurek took him from Illinois to Wisconsin for purposes of sexual conduct. Nurek traveled with the other minor victim between Illinois and Michigan for the same purpose. After lengthy pretrial proceedings, Nurek pleaded guilty to a single count of knowingly receiving child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A).

In calculating Nurek's advisory sentencing guidelines range, the district judge used the 2006 Guidelines Manual in effect at sentencing rather than the 2003 Guidelines Manual in effect when the offense was committed. The 2006 Guidelines Manual suggested a base offense level for Nurek that was five levels higher than the level suggested under the 2003 Guidelines Manual. The judge also applied a two-level enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1. The presentence report offered two evidentiary bases for this enhancement: Nurek's destruction of the computer hard drive found in the bucket of gasoline in his garage after his release on bond, and his repeated contacts with Victim B and his

family in violation of the terms of his pretrial release order. The district judge rejected the first basis, characterizing Nurek's successful obliteration of his computer hard drive as raising only a "mere suspicion." The judge accepted the second basis, however, finding that Nurek had attempted to influence Victim B and exert control over Victim B's family through his continuous contacts with them in violation of his pretrial release order. Finally, over the government's objection, the judge applied a two-level reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1(a). The government refused to request an additional one-level reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1(b), and the district court noted that it had no discretion to grant Nurek the third point without a motion by the government.

The resulting advisory guidelines range was 292-365 months, well above the statutory maximum of 240 months, so the range defaulted to the statutory maximum. *See* U.S.S.G. § 5G1.1(a). The district court considered Nurek's arguments in mitigation, including his claim, based on an expert opinion from a clinical psychiatrist, that he was a good candidate for a shorter sentence and sex-offender treatment. The judge thought Nurek's conduct was too serious and his risk of recidivism too great to justify a shorter sentence and imposed the maximum sentence of 240 months.

## II. Discussion

Nurek challenges his sentence on four grounds: (1) he claims the district court erred by applying the two-

level obstruction-of-justice enhancement under § 3C1.1; (2) he claims he should have received an additional one-point reduction for acceptance of responsibility under § 3E1.1(b) even though the government did not move for the reduction; (3) he claims the district court violated the Ex Post Facto Clause by using the 2006 Guidelines Manual rather than the 2003 Guidelines Manual; and (4) he claims that 240 months is an unreasonable sentence. None of these arguments has merit.

## A. Obstruction of Justice

Nurek argues that the district judge erred by imposing the two-level enhancement for obstruction of justice under § 3C1.1 of the guidelines. That provision states that a judge may increase the defendant's offense level by two levels "[i]f (A) the defendant willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." U.S.S.G. § 3C1.1. Here, the district judge imposed the enhancement because Nurek violated the terms of his pretrial release order by repeatedly contacting Victim B and his family in an attempt to maintain control over the family and otherwise influence their willingness to cooperate with the prosecution.[1]

---

[1] Because we agree with the district court's application of the obstruction-of-justice enhancement based on Nurek's contact

(continued...)

Nurek argues first that the facts do not support a finding of obstruction of justice. He cites *United States v. Scott* for the proposition that obstruction under § 3C1.1 only occurs when the defendant makes it "more costly or otherwise more difficult for the government to prosecute its case." 405 F.3d 615, 618 (7th Cir. 2005). Nurek contends that he did not threaten or intimidate Victim B and his family, but instead had only "friendly" conversations and other innocent communications with them. He argues that these contacts were intended to maintain his "close relationship" with them and persuade them not to initiate a *civil* lawsuit against him, not to make it more difficult for the government to prosecute the child-pornography charges.

We are not persuaded. Under the circumstances, no reasonable judge would be. Nurek's benign interpretation of the facts is not remotely plausible. Viewed in context and in light of Nurek's history, these particular bond violations can *only* be understood as insidious attempts at victim manipulation. This kind of behavior by a man in Nurek's position cannot possibly be passed off as mere "friendly" concern and disinterested generosity. Nurek was facing multiple felony child-pornography counts and the likelihood of spending the rest of his life in prison if convicted; the possibility of a civil suit was the

---

[1] (...continued)
with Victim B and his family, we need not address the alternative ground for the enhancement—that is, Nurek's destruction of his computer hard drive while out on bond.

*least* of his problems. Nurek's letter to Victim B is particularly revealing; in it Nurek tells Victim B that he loves him, misses him, and wants to take care of him and be "a good dad" to him. Then he closes the letter with a caution: "Don't say anything to anyone about this letter—this letter is for you! Don't slip, the agents are just waiting for something like this."

The district court was quite right to conclude that this conduct was intended to hamper the prosecution. Victim B had seen Nurek viewing and masturbating to child pornography multiple times and therefore was an eyewitness to the child-pornography offenses. Moreover, Nurek's molestation of Victim B was as yet unknown (though suspected) and, unlike the Michigan victims, was recent and more readily provable *provided* Victim B felt safe enough to cooperate with the prosecution. Indeed, Nurek's cynical manipulation of Victim B and his family had the desired effect of inhibiting the prosecution; it was only *after* Nurek's bond was revoked that Victim B revealed Nurek's past sexual abuse. The superseding indictment subsequently added the charges of transporting a minor across state lines to engage in sexual conduct. On the totality of these facts, it would have been error *not* to apply the obstruction enhancement.

Nurek also argues that the district court did not make adequate findings on Nurek's specific intent to obstruct justice. For an obstruction-of-justice enhancement to apply, the government must establish by a preponderance of the evidence that the defendant had the specific intent to obstruct justice. *United States v. Dale*, 498 F.3d 604, 609

(7th Cir. 2007). This intent requirement stems from language in the guideline requiring that the defendant "*willfully* obstruct[] . . . or attempt[] to obstruct" justice. U.S.S.G. § 3C1.1 (emphasis added). However, the sentencing judge is not required to parrot back the "willful" language of the guideline when deciding that an obstruction enhancement is appropriate. Rather, we have suggested that the enhancement is appropriate as long as the district court "includes implicitly a finding that [the defendant] intended to obstruct justice." *Dale*, 498 F.3d at 609.

Here, the district court's findings, while somewhat unclear, were sufficient to support the obstruction enhancement. The court acknowledged the possibility that Nurek might have had mixed motives for contacting Victim B's family but held that "one of the reasons that you had a dialogue with them was that you hoped that that would ameliorate the consequences of the arrest and charges." The judge said: "I believe that . . . one of the motives was to promote a positive relationship, insofar as it was possible, with [Victim B's family]—and that was at a time when you hadn't pled guilty and the legal state of things was uncertain—and so I believe that obstruction of justice for that is an appropriate enhancement."

Nurek maintains that the court's only explicit "finding" was that Nurek was trying to "promote a positive relationship" with the family—not enough, he says, to support a finding of intent to obstruct. He also notes that the judge said he was making "a very subjective

judgment" and "could be wrong" and "might be wrong." It is not clear what moved the court to add this gratuitous postscript, but we see it as just that—a wholly gratuitous statement or at most a commentary on the inherent difficulty of evaluating motive or intent. Either way, it does not undermine the court's ruling. When read in context and in their entirety, the court's remarks on the application of the obstruction enhancement contain an implicit finding that Nurek intended to obstruct the prosecution. That is enough to sustain the two-level enhancement.

## B. Acceptance of Responsibility

The effect of the obstruction enhancement was wiped out, however, when the district court applied a two-level reduction in Nurek's offense level for acceptance of responsibility. *See* U.S.S.G. § 3E1.1(a). The judge thought the acceptance-of-responsibility reduction was warranted because Nurek did not take any positions inconsistent with the government's allegations and agreed to pay restitution to the victims of his sexual abuse. Nurek also argued for the third acceptance-of-responsibility point under subsection (b) of § 3E1.1. The government objected; it was opposed to *any* acceptance of responsibility reduction, and having lost that battle, refused to move for the extra point under § 3E1.1(b). The judge said he could not consider the third-point reduction in the absence of a motion from the govern-ment. This was manifestly correct. The guideline specifi-cally states that an additional one-level reduction for

acceptance of responsibility is possible only if the government requests it; an additional one-point reduction is awarded "upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1(b).

Here, the government refused to move for the additional reduction because Nurek only pleaded guilty to one of ten counts, he frivolously contested the obstruction-of-justice enhancement, he showed no real remorse for his actions, and his "offer" to make restitution to the victims was simply an agreement that his $500,000 bond would be forfeited to the victims rather than the court. Because the government did not move for the additional reduction, the district court properly rejected Nurek's argument for a third acceptance-of-responsibility point. U.S.S.G. § 3E1.1 cmt. n.6 ("[A]n adjustment under subsection (b) may only be granted upon a formal motion by the Government at the time of sentencing.").

Nurek argues on appeal that the government has only limited discretion to withhold a motion for a third-level reduction under § 3E1.1(b). Not true. We have recently reiterated that although subsection (a) of the acceptance-of-responsibility guideline "confers an entitlement on the defendant[] if he satisfies the criteria in the subsection,"

subsection (b) "confers an entitlement *on the government." United States v. Deberry*, No. 09-1111, 2009 WL 2432481, at *1 (7th Cir. Aug. 11, 2009). Subsection (b) of § 3E1.1 is thus "a license for prosecutorial discretion." *Id.* If the government "wants to give the defendant additional credit for acceptance of responsibility . . . and can satisfy the criteria in the subsection, it can file a motion and the defendant *will* get the additional one-level reduction in his offense level." *Id.* The prosecutor's discretion is therefore quite broad, though not limitless; the government "may not base a refusal to file a motion under section 3E1.1(b) on an invidious ground, or . . . on a ground unrelated to a legitimate governmental objective." *Id.* at *2.

Here, the government's reasons for refusing to file a § 3E1.1(b) motion were hardly invidious or unrelated to a legitimate governmental objective. To the contrary, the government's arguments would have fully supported a decision to deny the two-point reduction under subsection (a) of the guideline, had the district court so ruled. Nurek *did* frivolously contest the obstruction-of-justice enhancement, for the reasons we have already noted. He pleaded guilty to just one of ten counts and demonstrated little real insight into or remorse for the depravity of his conduct. His "agreement" to make restitution cost him nothing; his bond would have been subject to forfeiture anyway based on his violations of the terms of his pretrial release order. The government acted well within its discretion in withholding a motion for the additional one-point reduction for acceptance of responsibility under § 3E1.1(b).

**C.  Use of 2006 Guidelines Manual**

Nurek next argues that the district court's use of the 2006 Guidelines Manual rather than the 2003 Guidelines Manual violated the Ex Post Facto Clause of the United States Constitution. Nurek's argument is squarely fore-closed by *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006). *Demaree* held that application of the guidelines manual in effect at sentencing rather than the one in force at the time of the defendant's crime does not violate the Ex Post Facto Clause, even if the current manual suggests a harsher sentence for the defendant. Nurek invites us to reconsider *Demaree.* We decline the invitation.

A law violates the Ex Post Facto Clause if it creates a substantial risk of an increased penalty after a crime has been committed. *See Garner v. Jones*, 529 U.S. 244, 255-56 (2000). We held in *Demaree* that a change in the guide-lines does not violate the Ex Post Facto Clause because after *United States v. Booker,* 543 U.S. 220 (2005), the guide-lines are purely advisory. We held that "the ex post facto clause should apply only to laws and regulations that bind rather than advise." *Demaree*, 459 F.3d at 795. After we heard oral argument in this case, the D.C. Circuit rejected our view in *Demaree* and held instead that "[i]t is enough that using the 2006 Guidelines created a sub-stantial risk that [the defendant's] sentence was more severe." *United States v. Turner*, 548 F.3d 1094, 1100 (D.C. Cir. 2008).  The D.C. Circuit focused on the practical application of the guidelines, noting that trial judges usually sentence within the guidelines "in order to avoid the increased scrutiny [on appeal] that is likely to result

from imposing a sentence outside the Guidelines." *Id.* at 1099.

We anticipated this argument in *Demaree* and rejected it, noting that the presumption of reasonableness that adheres to a within-guidelines sentence only applies on appeal. *Demaree,* 459 F.3d at 794. At sentencing, a district judge "is not required—or indeed permitted—to 'presume' that a sentence within the guidelines range is the correct sentence . . . . [H]is freedom to impose a reasonable sentence outside the range is unfettered." *Id.* at 794-95 (citation omitted). The Supreme Court reiterated this point in both *Gall* and *Rita. See Gall v. United States*, 128 S. Ct. 586, 597 (2007) ("In [calculating the sentence, the judge] may not presume that the Guidelines range is reasonable."); *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). Given the breadth of the district court's *Booker* sentencing discretion and the requirement that judges independently evaluate the sentencing factors specified in 18 U.S.C. § 3553(a), we think our conclusion in *Demaree* remains sound.

### D. Reasonableness of the Sentence

Finally, Nurek argues that his 240-month sentence is unreasonable in light of § 3553(a)'s sentencing factors. Specifically, he contends that the district court gave insufficient weight to his primary argument, which was premised on the opinion of his expert, Dr. Richard Abrams,

that a sex-offender treatment program would "cure him and prevent recidivism" and therefore a lengthy period of incarceration was unnecessary. The record refutes this claim; the district judge evaluated Dr. Abrams's testimony and indeed, questioned the expert himself for several minutes. In arriving at the 240-month sentence, the judge was skeptical of the possibility that Nurek could be successfully treated, although he agreed to recommend that he receive sex-offender treatment while in prison. The judge ultimately concluded that incapacitation was necessary based on the seriousness of Nurek's offense conduct, his history, and the high risk of recidivism: "[T]he one thing I am sure of in this is that the best way to protect the public is for Mr. Nurek not to be free for as long as possible."

Nurek also faults the district court for not giving sufficient weight to his age (59 years old) and his physical and mental-health problems (including asthma, high blood pressure, and a history of depression and alcoholism, among other ailments). Although the judge did not discuss each of these factors individually, he did, in the context of discussing Dr. Abrams's opinion, refer to Nurek's psychological background and the improbability of successful rehabilitation. Nurek's physical ailments and age are not significant mitigating factors in the context of this case, and as such, the district court need not have separately addressed them. *United States. v. Martinez,* 520 F.3d 749, 752-53 (7th Cir. 2008) (insubstantial sentencing arguments may be rejected without discussion); *United States v. Shannon,* 518 F.3d 494, 496 (7th Cir. 2008) ("The court need not address every § 3553(a)

factor in checklist fashion, explicitly articulating its con-
clusions regarding each one.").

The district court gave specific and appropriate con-
sideration to the relevant § 3553(a) factors and Nurek's
primary sentencing argument, which focused on Dr.
Abrams's opinion about his amenability to treatment. The
240-month sentence—the default guidelines range under
§ 5G1.1(a)—is presumed reasonable on appeal and re-
viewed deferentially. *Rita,* 127 S. Ct. at 2465; *United States
v. Haskins,* 511 F.3d 688, 695 (7th Cir. 2007); *United States v.
Mykytiuk,* 415 F.3d 606, 608 (7th Cir. 2005). Nurek has not
rebutted the presumption or convinced us that the
district court abused its discretion. Under the extremely
aggravated circumstances of this case, the 240-month
sentence was a reasonable one.

AFFIRMED