In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2472

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIC MICHAEL CHEEK,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 11-CR-10040 — **James E. Shadid**, *Chief Judge.*

ARGUED OCTOBER 31, 2013 — DECIDED JANUARY 22, 2014

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Eric Cheek distributed illegal drugs for most of his adult life. Prior to this case, he was convicted of twelve offenses, including nine felony drug offenses. Following an extensive investigation, law enforcement officers arrested Cheek in 2011 for drug distribution activities. A jury convicted Cheek of four felonies, and the district court sentenced Cheek to 576 months' imprisonment. Cheek appeals both his convictions and sentence. For the reasons discussed below, we affirm.

## I. Background

From 2002–2003, Eric Cheek regularly sold marijuana and crack cocaine to a drug dealer, Corey Eason, and Eason's girlfriend, Tabitha Harris. While Cheek was in prison in 2004, one of his associates, Antonio Seymon, supplied Eason and Harris with drugs. After he was released, Cheek again supplied Eason and Harris with marijuana and crack cocaine. He also supplied two other drug dealers, Langston Pates and Andra Pace, with marijuana. He was subsequently incarcerated again in 2008, and before his release in 2010, Cheek informed Eason, Brandon Williams (who had been in the same prison as Cheek in 2008), and Seymon that he would continue selling drugs upon his release. In August 2010, law enforcement persuaded Eason to cooperate in the investigation of Cheek. Eason performed controlled buys of illegal drugs from Cheek and secretly recorded his interactions with Cheek. With court authorization, law enforcement also intercepted more than 20,000 phone conversations and text conversations from telephones used by Cheek and his associates. The investigation uncovered continued drug operations until Seymon was arrested on March 23, 2011. Cheek subsequently was arrested on April 5, 2011.

A grand jury indicted Cheek and three co-defendants, Tabitha Harris, Brandon Williams, and Antonio Seymon, for various drug offenses. Cheek was charged with conspiring to possess and distribute more than 280 grams of crack cocaine and more than 100 kilograms of marijuana from 2001 to 2011; intending to distribute more than 28 grams of crack cocaine on August 9, 2010; intending to distribute marijuana on March 23, 2011; and using a telephone on February 11 and 23, 2011, to

facilitate the drug conspiracy. All three co-defendants pleaded guilty. Cheek did not.

Prior to Cheek's trial, the government filed an information pursuant to 21 U.S.C. § 851 expressing its intent to seek an enhanced sentence for Cheek based on seven prior felony drug convictions. In a separate pretrial filing, the government identified several potential expert witnesses. Most of these experts were forensic chemists who were not called at trial because their opinions were presented at trial by stipulation. However, one of the proposed experts (who did not testify at trial) was a Drug Enforcement Agency supervisor who was prepared to testify generally about the use of code words by drug dealers.

A few weeks before trial, Cheek sent a hand-written letter to Harris's teenage daughter in response to a letter he had received from the daughter. Cheek's letter stated in pertinent part:

> I remember when I met your little butt too. Yes I am your uncle and you would probably be out there if I wasn't hard on you at times. I only did it out of love for you and fear of what you could turn into without guidance. You were the one Eric & Mikey [Cheek's sons] asked about 1st back in the day. … It's been so long since the days I tried to teach you about a dollar by letting you watch the boys for $10–$15.

> Now you've got your own little one. And a pretty one at that. You know she would love me right? I am gonna fight to the end to be able to raise my kids and see yall again soon. Free [meaning Tyrell

Binion] got 54 months, so he will be out soon. My situation ain't or wasn't bad shall I say. I won't lie Isa, they didn't have shit on none of us. To prove it why would they need your Mom to lie on me if they had something? But the worse part is her own lawyer tricked her because she could've beat the case. She couldn't get more than 5 if she would've just plead guilty without lying on me. Now my life and the lives of my kids lay in the balance of her story she let them make her say. The most she can get is 5 and me LIFE if she doesn't tell the truth. Isa that means I will NEVER see my kids or family again. Nor see yall or any of the people I know and love. Who is gonna teach Er[i]c & Mikey to fight and be men? Who is gonna keep boys away from Emmy [Cheek's daughter] and not let her be like her mom? LIFE means forever!

So as you can see why I am saying this but, yes I love you … & your mom. But no I will never respect her decision. Still I am looking at LIFE and not because of anybody but her, the person I thought would never lie on me or hurt me. Even if she told the truth she wouldn't be looking at shit but maybe 6 more months but at least I wouldn't be in jail for the Rest of my life. So I am praying that she don't let them keep scaring her. They are gonna use plenty of scare tactics. But it's up to us to man up or woman up.

…

If God is willing you know who won't tell that lie and I will be there to see yall in the near future. My lawyer [is] saying that is the only thing they have against me is her.

At trial, the government called law enforcement officers and cooperating witnesses, including Eason, Harris, Pates, Pace, and Victoria Williams (who lived with Eason during the conspiracy). The government also offered selections from the intercepted telephone communications and interactions recorded by Eason. The government provided the jury with transcripts of these recordings that contained (within square brackets) interpretations of certain words and phrases from the recordings. The intercepted communications, recordings, and transcripts were admitted into evidence by stipulation. Cheek stipulated that the communications, recordings, and transcripts were accurate, but refused to stipulate to the accuracy of the interpretations within the brackets. Before the recordings were played, the district court instructed the jury that the recordings were the actual evidence and that the transcripts were not evidence[1]. The government elicited testimony from FBI Special Agent Greg Catey, the lead case agent, who offered his opinions regarding the meaning of the words and phrases immediately preceding the bracketed information contained within the transcripts. Agent Catey testified that he had extensive experience in drug enforcement and had participated in numerous investigations during his law enforcement career.

---

[1]   This instruction is difficult to reconcile with the fact that the intercepted communications, recordings, and transcripts were admitted into evidence by stipulation.

However, he also testified that he knew the meaning of the words in the transcripts based on his specific involvement in the investigation of Cheek and his co-conspirators. Police Detective James Ferguson similarly offered testimony about some of the code words and phrases used by Cheek and his co-conspirators, and stated that his knowledge was based on his participation in this investigation.

In his defense, Cheek argued that he only sold marijuana and did not conspire with anyone. The jury convicted Cheek on all counts. By special verdict, the jury found that the conspiracy involved at least 28 grams but less than 280 grams of crack cocaine and 100 kilograms or more of marijuana.

Cheek's pre-sentence report ("PSR") found that Cheek was responsible for the drug-quantity-equivalent of between 3,000 and 10,000 kilograms of marijuana, which placed his base offense level at 34. However, the PSR recommended a 2-level upward adjustment under U.S.S.G. § 3B1.4 because Cheek used a minor in commission of the conspiracy; a 4-level upward adjustment under U.S.S.G. § 3B1.1(a) because Cheek was the leader of a drug-trafficking organization; and a 2-level upward adjustment under U.S.S.G. § 3C1.1 for obstruction of justice because of the letter he sent to Harris's daughter. The PSR recommended a criminal history category of IV due to nine criminal history points. (The PSR found that Cheek had twelve prior convictions, including nine felony drug convictions.) Ultimately, the PSR calculated Cheek's total offense level at 42. Given Cheek's criminal history category of IV, the PSR calculated Cheek's Guidelines range to be 360 months to life. Cheek objected to the obstruction of justice enhancement. But even without that enhancement, Cheek's Guidelines range

would have been 360 months to life. Cheek did not otherwise object to the PSR's Guidelines calculations or findings regarding his prior convictions.

Counts I and II carried the greatest statutory maximum penalties: 480 months. The statutory maximum penalty for count III was 120 months. The statutory maximum penalties for counts IV and V were 48 months. However, 21 U.S.C. § 841(b)(1)(B)'s career criminal provision authorized the district court to impose a sentence of up to life on either count I or II. In order to do so, the district court must "before pronouncement of sentence inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." 21 U.S.C. § 851(b). At sentencing, the district court did not comply with § 851(b).

The government requested a prison sentence of "not less than 40 years," and argued that Cheek was "a bane to society" whose operations covered significant portions of Illinois and included enormous drug quantities. The government emphasized that it was unusual that Cheek had managed to remain out of custody after racking up so many prior felony drug convictions. The government characterized Cheek as a dishonest and manipulative person who was willing to use a minor to further his conspiracy and used profane language in her presence when she "couldn't get his money laundering down right." In closing, the government reiterated its request "for a sentence within the guideline range."

In response, Cheek's attorney emphasized that violence was never part of Cheek's admittedly extensive drug-dealing career. Cheek's attorney also observed that, if the district court imposed a 480-month sentence, Cheek would be "77 years old if he was ever able to get out of the penitentiary." During his allocution, Cheek admitted that he was not "the best person in the world," but repeatedly asserted that he was "not the worst person in the world either." Cheek briefly detailed a past incident in which he had assisted the police by informing them that accusations against Detective Ferguson (who happened to be a witness at Cheek's trial), involving misconduct allegedly occurring in Cheek's presence, were false. Cheek also told the district court that his mother had died when he was 16 years old, and that he had four children whom he loved and wanted to be there for.

After reciting the factors from 18 U.S.C. § 3553(a), the district court told Cheek, "I'm not saying you're a bad person." The district court commented that Cheek was clearly an intelligent person who spoke well and made a "nice appearance." But the district court noted that, despite Cheek's potential, he had chosen from a young age to engage in criminal drug activity. The district court observed that Cheek had opportunities to turn aside, but time and again "chose to continue in the drug world, and the drug trafficking world," which leads "only to violence and death on city streets of young people or a sentence to prison." The district court concluded that based on Cheek's decision to play by his own rules and significant history of criminal activity, a significant prison sentence was appropriate. Therefore, the district court imposed prison sentences of 576 months on counts I and II. The

district court also imposed prison sentences of 120 months on count III and 48 months on counts IV and V. The court directed that all sentences would run concurrently. Cheek appeals both his convictions and sentences.[2]

## II. Analysis

On appeal, Cheek argues that his convictions should be vacated because Agent Catey's testimony included expert testimony that should not have been admitted, and because the jury should not have been provided (either at trial or in deliberations) with copies of the transcripts containing Agent Catey's interpretations (in square brackets) of various words and phrases from the recordings played at trial. Cheek also argues that his sentence should be vacated because the district court failed to comply with the procedure provided in § 851(b). Additionally, Cheek contends that the district court violated his rights under the Fifth and Sixth Amendments to the Constitution as interpreted by the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), when the district court invoked § 841(b)(1)(B), which enhanced Cheek's potential sentence beyond the 480-month statutory maximum penalties for counts I and II, because the jury did not find beyond a reasonable doubt that Cheek had been convicted of the prior felonies supporting application of § 841(b)(1)(B). Cheek also argues that his sentence is procedurally unreasonable because the district court erred in imposing the obstruction of justice enhancement and failed to consider meaningfully the argu-

---

[2]   Because Cheek's sentences run concurrently, we refer to them as his 576-month sentence.

ments Cheek offered in mitigation of his sentence under § 3553(a). Finally, Cheek contends that his 576-month sentence is a *de facto* life sentence that is substantively unreasonable.

### A. Agent Catey's Testimony and the Opinions Contained in the Transcripts Provided to the Jury

Cheek's challenges to his convictions arise from portions of Agent Catey's testimony at trial and from the use of transcripts (both during trial and deliberations) containing Agent Catey's interpretations (in square brackets) of various words and phrases within the transcripts. Because he did not object, Cheek concedes that our review is for plain error. "Applying this standard, we reverse only when we find: '(1) an error or defect (2) that is clear or obvious (3) affecting the defendant's substantial rights (4) and seriously impugning the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Johnson*, 680 F.3d 966, 973 (7th Cir. 2012) (quoting *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010)).

### Agent Catey's Testimony

Cheek contends that Agent Catey offered expert testimony when testifying as a lay witness. Specifically, Cheek argues that Agent Catey testified as an expert about the meaning of drug code words and phrases used by the conspirators, the price for a kilo of cocaine, the main ingredient in crack cocaine, how a wiretap is physically conducted, and the meaning of such terms as "wire room, minimization, sessions, magneto optical disk, pen register trap and trace, spin off wiretap, special federal officer, case agent, controlled buy, front and controlled payment." Cheek argues that allowing Agent Catey to offer expert testimony under the guise of lay testimony

cloaked that testimony in an aura of expertise without subjecting it to the reliability standards of Fed. R. Evid. 702 or the mandatory pretrial disclosure requirements of Fed. R. Crim. P. 16.

The government may use a law enforcement officer as both an expert and lay witness in the same trip to the witness stand. *United States v. York*, 572 F.3d 415, 425 (7th Cir. 2009). However, there are some inherent dangers with this kind of dual testimony. For example, the witness's dual role might confuse the jury. Or, the jury might be smitten by an expert's "aura of special reliability" and therefore give his factual testimony undue weight. Or, "the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial." *Id*. (citations omitted).

The government argues that these concerns do not apply in this case because Agent Catey was only called as a lay witness. As far as Agent Catey's testimony about the drug code words and phrases used by Cheek and his co-conspirators are concerned, we agree. When a law enforcement officer testifies about the meaning of drug code words used by defendants based on personal knowledge obtained from the investigation of those defendants, the officer is testifying as a lay witness. *United States v. Moreland*, 703 F.3d 976, 983 (7th Cir. 2012). However, if the officer testifies from "expertise having derived from his involvement in other drug investigations," then the officer is testifying as an expert witness. *Id.* As the lead case agent, Agent Catey was intimately involved in the investigation of Cheek and his co-conspirators. For example, he reviewed more than 20,000 intercepted communications and

interviewed more than 100 witnesses as part of the investigation into the conspiracy. Moreover, when the prosecutor questioned Agent Catey about the meaning of the drug code words used by the conspirators, the prosecutor phrased his questions in terms of Agent Catey's "understanding based on this investigation" or "familiarity with this investigation." These facts convince us that Agent Catey's testimony about the drug code words and phrases used by Cheek and his co-conspirators "was based on his own personal observations and perceptions derived from this particular case." *United States v. Rollins*, 544 F.3d 820, 833 (7th Cir. 2008) (finding law enforcement witness's interpretations of code words as admissible lay testimony where witness based interpretation only on listening first-hand to numerous recorded telephone calls in that particular investigation). And the fact that Agent Catey was an experienced investigator does not alter this conclusion. *See Moreland*, 703 F.3d at 983 ("Had the agent been testifying exclusively as a lay witness about the code words he had learned the meaning of in the course of his investigation of the defendants' conspiracy, it would not have been improper to introduce him to the jury as an experienced investigator, rather than a novice listening to taped conversations of drug conspirators for the first time, any more than it is improper to ask an eyewitness whether he has good vision."). At the very least, it would not have been "clear or obvious" to the district court that Agent Catey was offering expert testimony about the drug code words and phrases used by the conspirators.

Moreover, even if Agent Catey's testimony about the drug code words and phrases used by the conspirators could be labeled as improperly admitted expert testimony, any error

would be harmless. First, the overwhelming evidence offered at trial demonstrates that Agent Catey's interpretations of the drug code words and phrases used by Cheek and his conspirators were accurate. For example, Cheek focuses on Agent Catey's testimony that the words or phrases "girl," "girly," or "bumping into ol' girl" were references to "cocaine or crack cocaine." Harris, Eason, and Williams testified that these terms referred to cocaine or crack cocaine. *See* Trial Tr. 161 (Harris testifying that "ol' girl" referred to "cocaine"); 428–29 (Eason testifying that "ol' girl" means "cocaine" and "girl" means "cocaine"); 675–76 (Williams testifying that "Christina, ol' girl, [and] white girl" refer to "crack cocaine"). And Goodwin testified that Cheek used these terms to refer to cocaine. *See* Trial Tr. 631–33; 637 (Goodwin testifying that Cheek used "ol' girl" to refer to "cocaine"). Second, at oral argument, Cheek's counsel conceded that Agent Catey would likely have been qualified as an expert. *See United States v. Jones & Brown*, Nos. 11-3864 & 12-1695, slip op. at 10, 2014 WL 68143 (7th Cir. Jan. 9, 2014) (finding no harm from failing to comply with Rule 702 with respect to a detective who offered expert testimony where the defendant did not challenge the detective's qualifications or the validity of his testimony); *United States v. Tucker*, 714 F.3d 1006, 1016 (7th Cir. 2013) ("Further, [the defendant] does not question Officer Baranek's qualifications, and there is little doubt he would have been able to be qualified as an expert, thus failure to 'formally anoint' him as such is harmless."). Indeed, before trial the government disclosed that it would call a DEA agent to testify regarding the meaning of drug code words and phrases used by the drug dealers in general. Thus, Cheek had notice that the government intended to offer the

kind of testimony that Agent Catey offered concerning the
meaning of drug code words and phrases used by the conspir-
ators. *See Jones & Brown*, Nos. 11-3864 & 12-1695, slip op. at 10.
For both these reasons, no harm could have come to Cheek
from failing to subject Agent Catey's testimony about the drug
code words and phrases used by the conspirators to the
reliability standards of Rule 702 or the mandatory pretrial
disclosure requirements of Rule 16.

Assuming that Agent Catey's testimony about the drug
code words and phrases used by the conspirators was lay
testimony, Cheek contends alternatively that the testimony
was not "helpful," and consequently inadmissible, *see* Fed. R.
Evid. 701(b), because Agent Catey testified that the code words
could refer either to cocaine or crack cocaine—but Cheek was
only charged with crack cocaine offenses. We disagree. It
would have been improper for Agent Catey to state that the
code words referred only to crack cocaine given that they also
could refer to powder cocaine.[3] Agent Catey's testimony may
have been insufficient on its own to support Cheek's crack
cocaine convictions, but the testimony was certainly helpful to
the jury inasmuch as it excluded any other potential interpreta-
tion of the code words besides either "cocaine" or "crack
cocaine." And Cheek does not raise an insufficiency argument
on appeal.[4]

---

[3] Eason confirmed that "ol' girl" and "girl" can refer either to crack cocaine
or regular cocaine."

[4] Relatedly, Cheek argues that this testimony blurred the distinction
between powder cocaine and crack cocaine, which could have confused the

(continued...)

All of Agent Catey's remaining testimony about which Cheek complains could be properly admitted lay testimony. A witness could form true opinions regarding whether cocaine is the main ingredient in crack cocaine, how a wiretap is conducted, or the meanings of terms such as "wire room, minimization, sessions, magneto optical disk, pen register trap and trace, spin off wiretap, special federal officer, case agent, controlled buy, front and controlled payment," without that knowledge being based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. For example, the

---

[4] (...continued)

jury into convicting Cheek for crack cocaine offenses even though the jury only believed that Cheek had committed powder cocaine offenses. But evidence admitted at trial distinguished between powder and crack cocaine. *See* Trial Tr. 672 (Williams testifying that she received both "powder and hard crack"); 155 (Harris testifying that she'd never seen Cheek "with crack," but that twice bought cocaine from him); 532 (stipulation distinguishing between "cocaine base" and "powder cocaine"). And Cheek's defense was not that he was selling powder cocaine instead of crack cocaine. Moreover, as noted, while Agent Catey's testimony about the drug code words and phrases used by the conspirators would not have been sufficient on its own to support Cheek's crack cocaine convictions, Cheek does not raise an insufficiency argument on appeal. Anyway, the government offered sufficient evidence that Cheek committed the crack cocaine offenses with which he was charged. *See, e.g.*, Trial Tr. 113 (Agent Catey testifying that cooperating witnesses recorded purchases of crack cocaine from Cheek); 125 (Harris testifying that Cheek's conspiracy distributed crack cocaine); 405–06 (Eason testifying that he obtained crack cocaine from Cheek); 611 (Detective Ferguson testifying about controlled buy of crack from Cheek). Indeed, Eason testified that Cheek supplied him with 63 grams of crack cocaine every few weeks during 2002–2003, 2006–2008, and 2010–2011. *See* Trial Tr. 405–06, 411–13, 417–20. Thus, Cheek sold significantly more than 280 grams of crack cocaine to just one of his customers.

witness might have observed another person making crack cocaine or conducting a wiretap; or the witness might consult a dictionary. When Agent Catey testified about the ingredients of crack cocaine, he did not identify the source of his knowledge. And when he testified that $23.50 referred to $23,500 for a kilo of cocaine, he testified that his opinion was based on his review of the calls. With respect to this testimony, precisely because Agent Catey did not specify whether his opinions were based on "scientific, technical, or other specialized knowledge," we cannot say that it was "clear or obvious" that the testimony was expert in nature.

Moreover, Cheek does not dispute the accuracy of any of this testimony.[5] Indeed, as noted, Cheek's counsel conceded that Agent Catey would likely have been qualified as an expert. Therefore, the concern that Agent Catey's uncontested testimony may have been cloaked in an aura of expertise, while not concomitantly being subjected to the reliability standards of Rule 702 or the mandatory pretrial disclosure requirements of Rule 16, could not have affected Cheek's substantial rights. *See United States v. Sykes*, 614 F.3d 303, 312 (7th Cir. 2010) ("An error affects substantial rights when it 'affected the outcome of the district court proceedings.'" (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993))).

Perhaps Cheek believes that Agent Catey's testimony on these matters cloaked the rest of his testimony—including matters that were contested—in an aura of expertise. But

---

[5]   Detective Ferguson also testified that "$23.50" meant "$23,500." But Cheek does not object to Detective Ferguson's testimony.

Cheek does not explain how Agent Catey's undisputed testimony about the ingredients of crack cocaine, the meanings of technical terms, or the process for conducting a wiretap would bolster the rest of his testimony. Moreover, the government did not explicitly present Agent Catey to the jury *as an expert*. Consequently, there was little risk that the jury might have been confused by Agent Catey's "dual roles" as both an expert and lay witness, that his status as an expert might overawe the jury, or that the jury might have mistakenly believed that his expert opinions were based on facts about the defendant not presented at trial. *See United States v. Garcia-Avila*, 737 F.3d 484, 489 (7th Cir. 2013) (observing that the risk of unfair prejudice is reduced where a witness does not testify both as an expert and as a lay witness); *Moreland*, 703 F.3d at 983 (finding no "realistic danger" that the jury might be smitten by the agent's testimony). And the evidence of Cheek's guilt was overwhelming—Cheek admitted that he sold marijuana, and Detective Ferguson as well as a number of Cheek's co-conspirators testified that Cheek distributed crack cocaine. Therefore, any error in admitting Agent Catey's testimony on these matters would be harmless. *See United States v. Gaytan*, 649 F.3d 573, 582–83 (7th Cir. 2011); *Rollins*, 544 at 833 ("Besides, the other evidence of guilt of these two defendants is so overwhelming that even if the [officer's] 'impressions' testimony had crossed the line, it would have, at worst, amounted to harmless error.").

### The Transcripts

Cheek also contends that the district court erred in allowing the jury to have the transcripts (both during trial and deliberations) containing Agent Catey's interpretations. These interpre-

tations were inserted in square brackets following various code words and phrases from the recordings. Specifically, Cheek argues that this unfairly bolstered Agent Catey's testimony and usurped the fact-finding function of the jury.[6]

"[D]istrict courts have wide discretion in determining whether to allow juries to use written transcripts as aids in listening to audiotape recordings." *United States v. Breland*, 356 F.3d 787, 794 (7th Cir. 2004) (citing *United States v. Keck*, 773 F.2d 759, 766 (7th Cir. 1985)). And "[w]e have previously permitted transcripts to be admitted at trial and used by the jury during their deliberations when the underlying tapes are actually played during the trial (as was the case here)." *Breland*, 356 F.3d at 794–95 (collecting cases). In fact, Cheek's counsel explicitly informed the district court that the defense had no objection to providing the transcripts to the jury. *See* Tr. 67, 838.

Even assuming *arguendo* that providing the transcripts with Agent Catey's interpretations to the jury was error, any error would not have been "clear or obvious" to the district court given our precedent cited above and Cheek's disclaimer of any objection. Moreover, Cheek does not identify which (if any) of Agent Catey's interpretations contained in the transcripts are inaccurate. If Agent Catey's interpretations are correct, Cheek's substantial rights could not have been affected and the

---

[6] Based on interpretations in the transcripts that read "cocaine/crack cocaine," Cheek reiterates his concern that the jury may have been misled into convicting him for the crack cocaine offenses based on evidence that may have only proved powder cocaine offenses. For the reasons discussed above, this argument is without merit.

fairness, integrity, or public reputation of judicial proceedings could not have been seriously impugned.[7]

For support, Cheek cites our decision *United States v. Berry*, 92 F.3d 597, 601 (7th Cir. 1996), wherein, unbeknownst to the judge, the jury retained transcripts provided to them at trial during their deliberations. The district court granted the defendant a new trial and the government appealed.[8] On appeal, we observed that "the government's case was not strong," and that our "deferential review" led us to conclude that the district court did not abuse its discretion in granting a new trial. *Id.* at 601–02. We stated that "[a] criminal defendant has 'a right to be tried on the basis of the evidence admitted at

---

[7] We observe that Detective Ferguson testified that a number of the words or phrases in the transcripts meant what the interpretations in the adjacent square brackets stated. For example, the transcripts contained the word "kilograms" in square brackets following the word "books," the phrase "1/8th ounce or '8-ball' sample" in square brackets following the word "ball," and the phrase "$23,500 per kilogram" in square brackets following the number "$23.50," Detective Ferguson testified that he believed the word "book" as used in the recorded conversations between Cheek and others referred to a "kilogram of cocaine." He also testified that the word "ball" meant "a ball of cocaine" that was being given to a customer as a "sample." And he testified that "$23.50" meant "$23,500." Yet Cheek does not contend on appeal that the inclusion of these interpretations in square brackets in the transcripts unfairly bolstered Detective Ferguson's trial testimony or usurped the fact-finding role of the jury.

[8] Actually, the government appealed twice. The first time we remanded for the district court to explicitly determine whether there was a reasonable possibility that the jury's use of the transcript during deliberations prejudiced the defendant. *See United States v. Berry*, 64 F.3d 305, 308 (7th Cir. 1995).

his trial, and this right may be violated if the jury gets access to extra-record evidence … even if the access is not the result of any prosecutorial misconduct.'" *Id.* at 600 (quoting *United States v. Sababu*, 891 F.2d 1308, 1333 (7th Cir. 1989)). But here, unlike in *Berry*, the transcripts provided to the jury *were* admitted into evidence at trial by stipulation. *See* Tr. 67, 88. And our standard of review is at the opposite edge of the spectrum in this case—in *Berry* our highly deferential review (abuse of discretion) favored the defendant's position, whereas here our even more highly deferential review (plain error) favors the government's position. Moreover, unlike in *Berry*, the government's case is very strong—composed as it is from the testimony of five of Cheek's co-conspirators and Detective Ferguson as well as recordings of Cheek's communications and interactions with one of his customers. Therefore, we conclude that the district court did not plainly err—or at least that any error would be harmless—when the court permitted Agent Catey's testimony and allowed the jury to have the transcripts containing Agent Catey's interpretations in square brackets.

### B. Cheek's Challenges to his Sentence

Cheek argues that his 576-month prison sentence is procedurally unreasonable because the district court failed to comply with the procedure provided in § 851(b), erroneously invoked § 841(b)(1)(B), erroneously imposed the 2-level obstruction of justice enhancement, and failed to consider meaningfully Cheek's mitigation arguments. Additionally, Cheek contends that a 576-month sentence is a *de facto* life sentence that is substantively unreasonable.

### Section 851(b)/Apprendi Arguments

Cheek argues that his 576-month sentence must be vacated because the district court failed to comply with procedural requirements of 21 U.S.C. § 851(b) and because the sentence violates his rights under the Fifth and Sixth Amendments to the Constitution as interpreted by the Supreme Court in *Apprendi*.

None of the counts for which Cheek was convicted carries a statutory maximum penalty greater than 480 months' imprisonment. However, pursuant to 21 U.S.C. § 841(b)(1)(B), the district court could sentence Cheek to a prison term of up to life on counts I and II provided that Cheek had been previously convicted of at least one drug felony. The district court only could invoke § 841(b)(1)(B) if the requirements of § 851 were met. Cheek contends that the district court failed to comply with § 851(b)'s requirement that the court "after conviction but before pronouncement of sentence inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information."

Generally, "[w]hether the district court followed proper sentencing procedure is a legal question reviewed de novo." *United States v. Pape*, 601 F.3d 743, 746 (7th Cir. 2010). However, the government urges us to review the district court's compliance with § 851(b) for plain error because Cheek did not object to the criminal history section of his PSR and "did not object to the alleged procedural deficiency at the time of sentencing … ." *United States v. Corona-Gonzalez*, 628 F.3d 336, 340 (7th Cir. 2010). But the standard of our review does not affect the

outcome in this case. "No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction." 21 U.S.C § 851(e). And five of Cheek's seven felony drug convictions listed in the § 851(a) information filed by the government prior to trial occurred more than five years before the date the information was filed. Thus, Cheek was barred from challenging the validity of any of these five prior felony drug convictions. Only one such conviction was needed to trigger § 841(b)(1)(B). "A district court is not required to 'adhere to the rituals of § 851(b) where a defendant, as a matter of law, is precluded from attacking the conviction forming the basis of the enhancement information.'" *United States v. Flores*, 5 F.3d 1070, 1082 (7th Cir. 1993) (quoting *United States v. Nanez*, 694 F.2d 405, 413 (5th Cir. 1982)). So the district court did not err; but even if it did, any error was harmless. *See United States v. Williams*, 298 F.3d 688, 692–93 (7th Cir. 2002) (finding harmless any error resulting from the district court's failure to comply with § 851(b)); *United States v. Arango-Montoya*, 61 F.3d 1331, 1339 (7th Cir. 1995) (per curiam) ("Since [the defendant] attempts to challenge his prior conviction and § 851(e) bars him from doing so, any failure by the district court to 'inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence,' 21 U.S.C. § 851(b), is harmless.").

Cheek also contends that his 576-month sentence violates his rights under the Fifth and Sixth Amendments as interpreted by *Apprendi*. In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the

prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The question of whether Cheek had been convicted of any prior drug felonies is a factual prerequisite to the district court's invocation of § 841(b)(1)(B) and imposition of a prison term greater than 480 months. It is undisputed that this question was not submitted to the jury.

Cheek concedes that we review for plain error because he failed to raise any *Apprendi* argument before the district court. But we need not dally over the standard of our review because *Apprendi* expressly excludes any question of "the fact of a prior conviction" from the scope of its holding. *Id.* at 490. And even if we thought the Supreme Court was going to reconsider this ruling, it has "told the lower courts in no uncertain terms to leave the overruling of its precedents to it." *United States v. Ousley*, 698 F.3d 972, 976 (7th Cir. 2012) (quoting *United States v. Cephus*, 684 F.3d 703, 709 (7th Cir. 2012)). To the extent Cheek wishes to preserve his *Apprendi* argument for the Supreme Court, he has done so.

### Obstruction of Justice Enhancement

Next, Cheek contends that the district court improperly calculated his Guidelines range when it imposed a 2-level upward adjustment under U.S.S.G. § 3C1.1 for obstruction of justice. Guideline U.S.S.G. § 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to

(A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

The district court thought that Cheek's letter to Harris's daughter was an attempt to convince "the child to get to her mother." Thus, over Cheek's objection, the district court concluded that the letter constituted an obstruction of justice. However, the district court remarked, "I don't find [the letter] very significant."

"When reviewing an obstruction of justice enhancement, we review the underlying factual findings, like all such findings, for clear error, 'and we review de novo whether those findings adequately support the enhancement.'" *United States v. Taylor*, 637 F.3d 812, 817 (7th Cir. 2011) (quoting *United States v. Vallar*, 635 F.3d 271, 288 (7th Cir. 2011)). Cheek contends that the district court erred in concluding that the letter was obstructive because the letter urges Harris to tell the truth and urges Harris's daughter to respect her mother's decision. But, in the letter, Cheek also states that Harris's testimony for the government would be lies, that her testimony is all the government had to convict him, and that Harris had been tricked by her own lawyer. Cheek remarks that he will "never respect [Harris's] decision" and that he thought she would never lie about him. Cheek also notes that if Cheek is convicted, then he will go to prison for the rest of his life and be unable to raise his children or protect his daughter from boys. In conjunction with this expression of parental concern, Cheek also makes a flattering reference to Harris's daughter's child. Finally, Cheek invokes "God" and remarks that "it's up to us to man up or woman up." In short, Cheek's letter was an intentional effort

to convince Harris's daughter that her mother's testimony would be lies, which were the only evidence the government had against him, and that a conviction would ruin his "life and the lives of [his] kids." The district court reasonably interpreted this effort as a willful attempt to persuade Harris's daughter to try to sway her mother's testimony. Certainly this interpretation was not clearly erroneous. And an effort to influence a witness's testimony—albeit vicariously—is a prototypical example of obstruction of justice. *See* U.S.S.G. § 3C1.1 Application Note 4(A).

Moreover, even if the district court erred when it imposed the obstruction of justice enhancement, that error would be harmless. Enhancements are "used merely to determine the applicable Guidelines range." *States v. Maggi*, 44 F.3d 478, 482 (7th Cir. 1995). And the imposition of the obstruction of justice enhancement did not change Cheek's Guidelines range. In addition, the district court explicitly stated that he did not think the letter significant. Therefore, it is apparent that the enhancement did not affect Cheek's sentence. *See United States v. Eubanks*, 593 F.3d 645, 655 (7th Cir. 2010) ("To prove harmless error, the government must be able to show that the guidelines error did not affect the district court's selection of the sentence imposed." (quoting *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009)).

### Cheek's Arguments in Mitigation and the Section 3553(a) Factors

Cheek also contends that his sentence was procedurally unreasonable because the district court failed to consider that the sentence amounted to a *de facto* life sentence and did not

explain why it believed a sentence greater than that recommended by the government was reasonable. Cheek relies upon our decision *United States v. Patrick*, 707 F.3d 815, 819–20 (7th Cir. 2013), wherein the district court expressed an intent not to impose a life sentence but then imposed a sentence that effectively amounted to a life sentence. Under those circumstances, we were unable "to discern whether the court appreciated the severity of the sentence it imposed, and in particular its equivalence to the life sentence that it had purportedly rejected." *Id. Patrick* does not stand for the proposition that, every time a district court imposes a sentence that exceeds the defendant's life expectancy, the court must explicitly recognize that fact. And *Patrick* is distinguishable from Cheek's case because here the district court never stated that he wished to give Cheek something less than a life sentence. Instead, the district court explained that, based on Cheek's extensive "history of criminal activity," the court was untroubled by the fact that Cheek would be imprisoned "at least for a significant amount of time." Unlike in *Patrick*, we are able "to discern [that] the court appreciated the severity of the sentence it imposed … ." *Id.*

In arguing that the district court procedurally erred by failing to explain why it believed a sentence greater than that recommended by the government was reasonable, Cheek asserts that the government requested a 480-month sentence. That is not quite true; the government asked for "a sentence of not less than 40 years [480 months] in prison … ." Moreover, Cheek's sentence was within his Guidelines range, and "a within-guidelines sentence receives a presumption of reasonableness … ." *United States v. Diekemper*, 604 F.3d 345, 355 (7th

Cir. 2010). Where such a presumption applies, we doubt that a sentencing court has a procedural obligation to explain why it has chosen not to adopt the government's recommended sentence. And, as discussed below, the district court had good reasons for concluding that Cheek deserved a long sentence.

Cheek also argues that the district court failed to consider meaningfully the arguments Cheek offered in mitigation of his sentence under 18 U.S.C. § 3553(a). Cheek identifies the following factors as ones upon which he argued for leniency at sentencing: his age (37 years old), the extraordinary length of a Guidelines sentence of 360 months to life, his history of non-violence, his advanced age upon completing a lengthy sentence, that he had assisted law enforcement in an unrelated matter, that his mother had died when he was only 16 years old, and that he had children.

First of all, although Cheek's counsel remarked at sentencing that Cheek "is 37 years old," he did not develop any argument for leniency from that fact. And it is not apparent why Cheek's age would support leniency. Cheek is not so young that one might attempt to excuse his criminal activity as the result of immaturity—nor is he elderly. Therefore, we will not fault the district court for failing to mention explicitly Cheek's age during sentencing. *See United States v. Jones*, 438 F. App'x 515, 519 (7th Cir. 2011) (noting that the defendant "never explained why his age justified a below-guidelines sentence" and so the court was not required to address it). Similarly, our review of the sentencing transcript reveals no argument by either Cheek or his counsel that the "extraordinary length of a [Guidelines] sentence of 360 months to life" constitutes a basis for leniency.

Furthermore, most of Cheek's remaining arguments—namely, that he will be elderly when he is released from prison, that his mother died when he was only 16 years old, and that he has children—are the kinds of stock arguments that sentencing courts are not obliged to address. *See United States v. Brock*, 433 F.3d 931, 937 (7th Cir. 2006) (ruling that a district court may reasonably find arguments about a difficult childhood so weak as not to merit discussion where the defendant fails to explain why his difficult childhood should be a mitigating factor); *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008) (holding that "family ties" are "nothing more than stock arguments that sentencing courts see routinely"); *United States v. Nurek*, 578 F.3d 618, 626 (7th Cir. 2009) (holding that defendant's "physical ailments and [advanced] age are not significant mitigating factors" that the district court needed to separately address). Similarly, Cheek's argument that none of his numerous prior convictions involved violence is essentially an argument that his criminal history category substantially over-represents the seriousness of his past crimes. *See United States v. Stephen*, 160 F. App'x 505, 507 (7th Cir. 2005). This argument is also a stock argument that the district court was not required to address. *United States v. Moreno-Padilla*, 602 F.3d 802, 811–12 (7th Cir. 2010) ("To that end, there is no requirement that a district court extensively address non-principal arguments, or 'stock arguments that sentencing courts see routinely,' including 'how [a defendant's] criminal history category over-represents the seriousness of his prior conviction.'" (quoting *Tahzib*, 513 F.3d at 695)).

Cheek's final argument for leniency was based on the fact that he had once assisted law enforcement by clearing Detec-

tive Ferguson of accusations of misconduct. This was Cheek's most developed argument at sentencing. But the fact that Cheek did not lie to the police on an unrelated matter hardly constitutes the kind of meritorious conduct deserving of a sentencing reduction. And, to the extent Cheek's could be said to have rendered "substantial assistance" to the police, still "[a] defendant's claim that substantial assistance to the government warrants leniency is 'routine,' … and thus a sentencing court may reject that claim with little or no explanation." *See Jones*, 438 F. App'x at 519 (citing *United States v. Gonzalez*, 462 F.3d 754, 756 (7th Cir. 2006)).

Moreover, we will not find a sentence to be procedurally unreasonable as long as the totality of the record establishes that the district judge considered the arguments in mitigation, "even if implicitly and imprecisely." *Diekemper*, 604 F.3d at 355; *United States v. Poetz*, 582 F.3d 835, 839 (7th Cir. 2009). In this case, the district court recited the § 3553(a) factors and focused on Cheek's extensive criminal history—Cheek spent his entire adult life as a drug dealer and was convicted of nine prior felony drug convictions. The district court recognized that Cheek had offered arguments that he was not a bad person. Indeed, the district court told Cheek, "I'm not saying you're a bad person." Nevertheless, despite recognizing the good things about Cheek, the district court concluded that the facts surrounding Cheek's current offenses and his extensive history of criminal activity called for a significant prison sentence. Moreover, the district court's decision to impose a sentencing enhancement on Cheek for *obstructing* justice demonstrates that the court implicitly rejected any argument that Cheek's sentence should be reduced because he *assisted* justice. There-

fore, even assuming the district court was required to address Cheek's mitigation argument based on his prior assistance, we conclude that the court sufficiently considered it. In any event, even if the district court did not adequately consider this mitigation argument, the error would be harmless because the court's focus on Cheek's extensive and egregious history of criminal activity, and serious present offenses, convince us that Cheek's sentence would not have been different. *United States v. Glosser*, 623 F.3d 413, 419 (7th Cir. 2010) ("When we are convinced the sentence would have been the same absent the error, we deem the error harmless.").

### Substantive Unreasonableness

Finally, Cheek argues that his sentence—a *de facto* life sentence—is substantively unreasonably long. But Cheek's sentence was within his Guidelines range, and "a within-guidelines sentence receives a presumption of reasonableness … ." *Diekemper*, 604 F.3d at 355. Indeed, "such a sentence 'will almost never be unreasonable.'" *United States v. Vallar*, 635 F.3d 271, 279 (7th Cir. 2011) (quoting *Tahzib*, 513 F.3d at 695). In fact, the district court could have imposed a life sentence on Cheek and still remained within his Guidelines range. The district court recounted the § 3553(a) factors and concluded that, despite the significant cost of incarceration, a within-Guidelines sentence was appropriate in light of Cheek's egregious criminal history, including nine prior felony drug convictions, and serious present offenses, including distributing at least 28 grams of crack cocaine and 100 kilograms of marijuana. We previously have found lengthy sentences to be substantively reasonable under similar circumstances. *See, e.g., United States v. Taylor*, 701 F.3d 1166, 1175 (7th Cir. 2012)

(affirming 480-month sentence in light of egregious criminal conduct and extensive criminal history); *Vallar*, 635 F.3d at 280 (affirming 360-month sentence in light of "the seriousness of [the defendant's] crime, his past recidivism and the likelihood that he would continue to commit crimes if released from prison, the fact that he directed the operation of a drug distribution ring while in a federal prison, his lack of remorse for his offense, and its conclusion that [he] is a threat to society due to his persistent distribution of drugs."). The record demonstrates that Cheek has repeatedly refused to give up his life of criminal drug distribution—despite the efforts of the justice system to deter him. Cheek's sentence is lengthy, but we cannot say that the district court abused its discretion in concluding that Cheek deserved it.

## III. Conclusion

The district court did not plainly err when it admitted Agent Catey's testimony and permitted the government to provide the jury with transcripts containing Agent Catey's interpretations of various words and phrases from the recordings. At least, any error would have been harmless. Additionally, the district court did not err when it imposed a 2-level obstruction of justice enhancement, and the court adequately considered Cheek's mitigation arguments in light of the § 3553 factors. The district court's failure to comply with the procedure provided in § 851(b) was, at most, harmless error—especially given that Cheek's counsel never raised the issue. Finally, Cheek's 576-month prison sentence—authorized by § 841(b)(1)(B)—is not substantively unreasonable. Therefore, we AFFIRM Cheek's convictions and sentence.