In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-2829

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID D. MAJOR,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 19-cr-10014 — **James E. Shadid**, *Judge.*

_____

ARGUED NOVEMBER 2, 2021 — DECIDED APRIL 27, 2022

_____

Before SYKES, *Chief Judge*, and FLAUM and JACKSON-AKIWUMI, *Circuit Judges*.

FLAUM, *Circuit Judge*. David Major pleaded guilty without the benefit of a plea agreement to three charges stemming from his activities dealing heroin and fentanyl. Major was sentenced to twenty years' imprisonment. He now challenges the basis of his sentence, arguing that the district court's factual findings were erroneous and caused it to calculate an incorrect Sentencing Guidelines range. He also argues that his

designation as a "career offender" overstated his past criminal conduct, so that his sentencing under the career offender Guidelines range was therefore unreasonable.

Because the district court made no clear errors in its findings of fact and did not abuse its discretion in deciding Major's sentence, we affirm.

## I.    Background

### A.  A.K.'s Overdose Death and the Government's Subsequent Investigation

In December 2018, a twenty-six-year-old woman, A.K., was found dead in her bedroom in Pekin, Illinois, with fresh needle marks on her arm consistent with heroin use. An autopsy later determined that her cause of death was the "combined toxic effects of acetyl fentanyl, fentanyl, and Mitragynine," though officers did not find any drugs in the home.

Officers began investigating A.K.'s death and learned that the night before she died, she had taken an Uber home from an address where a person named Dawn Bukowski lived with her boyfriend. When the officers interviewed Bukowski, she admitted that she used heroin and had provided some to A.K. around 6:30 PM the night before she was found dead. Bukowski explained that A.K. had reached out to Bukowski's boyfriend through the "dark web," looking for heroin because she was afraid she was about to start experiencing withdrawal symptoms. A.K. did not know where else to obtain the drugs since she had only recently moved to the area. Bukowski's account was confirmed by text messages recovered from her phone. Bukowski's texts also revealed that she told her boyfriend A.K. was "really fucked up" after she injected the

drugs at Bukowski's home immediately after purchasing them. Bukowski later testified that she "could tell that [A.K.] was really, really messed up" shortly after taking the drugs, though she appeared to "snap[] out of it" by the time she left Bukowski's house, around 7:30 PM.

A.K. took the rest of her unused drugs with her when she left Bukowski and got in her Uber. The driver later told officers that A.K. seemed "intoxicated but not overly intoxicated" during the ride to her home. When A.K. arrived home, she greeted her parents, who said that she appeared normal, before heading to her room for the night. Her mother discovered her unresponsive in her bedroom around 5:30 AM the next morning.

Bukowski told the investigating officers that she had purchased the drugs she resold to A.K. from someone named "Don," whom the officers soon determined to be the Defendant, David Major. In February and March 2019, police set up a series of controlled drug buys from Major. Often, these buys resulted in the source receiving drugs directly from Major, but sometimes, Major would direct the source to contact "the girls," his associates Stephanie Lobb and Natalia Menchaca.

After the controlled buys, police arrested Lobb and Menchaca as they were returning to the Peoria area from Chicago. In their possession, the women had 9.4 grams of heroin and fentanyl. Both provided cooperative statements to law enforcement. Menchaca stated that she had been acquiring heroin from Major for about eight months and had worked for him for the last three months. She further stated that she and Lobb traveled to Chicago about once a week to purchase between a half-ounce and an ounce of heroin for Major. Lobb provided similar information and estimated that the pair had

made about fifteen trips to Chicago over the last few months for this purpose. Police subsequently arrested Major, who waived his *Miranda* rights and admitted that he sold drugs and had purchased them from a contact in Chicago. Text messages between Major and Bukowski confirmed that he sold her drugs and that his heroin was laced with fentanyl. For instance, he sent her a picture of a white, rock-like substance, with a caption referring to "that fintnal."

In April 2019, a grand jury indicted Major, Menchaca, and Lobb with drug-trafficking and conspiracy offenses (none of which directly pertained to the December 2018 drug transaction that led to A.K.'s death). Major eventually pleaded guilty to three charges: one count of conspiring between December 2018 and March 2019 to distribute and possess with intent to distribute heroin and fentanyl, *see* 21 U.S.C. § 846, and two counts of distributing heroin and fentanyl in February 2019, *see* 21 U.S.C. § 841(a)(1), (b)(1)(C). At the change-of-plea hearing, he specifically admitted under oath that he "actually distribute[d] heroin and fentanyl."

**B.  Incident Involving Major's Co-Defendant**

After Major entered his guilty plea, the Probation Office prepared a presentence investigation report ("PSR"), which, among other things, described the statements Lobb and Menchaca made to the police. Based on Menchaca's statements, the PSR indicated that the conspiracy involved over 100 grams of heroin and 0.4 grams of fentanyl.

A few months after the Probation Office filed its first PSR and while Lobb was on bail, she called her attorney to describe a disturbing incident, which her attorney then relayed to the police. Lobb stated that on the afternoon of April 28,

2020, she was approached at her place of work (Burger King) by someone she knew as "Ray Ray." She had met Ray Ray before and knew him as Major's close friend (at the time, she thought they were brothers) and his "enforcer." Ray Ray entered the drive-through lane going the opposite direction and pulled up to Lobb. He held up his phone and told her that Major wanted to talk to her. She responded that she could not talk to him, and Ray Ray then stated that he thought he had seen her walking a few days earlier. Ray Ray then drove off.

Lobb later testified that she felt "threatened and intimidated" by the incident, specifically because she had heard stories about Ray Ray's violent past and knew that Major relied on Ray Ray to "tak[e] care of things for him." In fact, Lobb testified, she had received a letter from Major from jail regarding the instant criminal conspiracy, instructing her to "stand tall or stay strong," because Major "kn[ew] who set [them] up" and "Ray Ray's gonna handle it." Lobb was sufficiently spooked by the incident that two days later she arranged with Pretrial Services to move out of the area.

To investigate this incident, officers obtained recordings of Major's phone calls from jail. From these calls, officers learned that Major told a variety of people that it was "very important" that he speak with Lobb. On April 27, Major placed one such call to his daughter, in which he asked if she remembered the "girl that people was talking about that you was supposed to be looking for?" His daughter responded that she did not remember her name, and Major explained that it was Lobb and further advised his daughter to call the Burger King where Lobb worked immediately after hanging up with him. He told his daughter to tell Lobb that Major was not mad at her and that nothing was going to happen to her.

Later that day, Major made a similar call to another woman. He told this woman to tell Lobb that Major was "not mad at her and ain't nobody going do shit to her. I need to talk to her, it's very important."

The next day, Major made a call and spoke to Ray Ray, whose real name is Kimmit Smith. Ray Ray told Major, "That bitch is scared as hell," to which Major replied that he knew it and that he hoped Ray Ray did not scare her. Major then laughed and said, "I hope you don't try and tell the people I'm trying to do anything … what they say?" Ray Ray told Major that the woman had asked what Major wanted her to say. Ray Ray then said, "Some things a mother fucker can't say over these lines." Major replied, "I know, that's the truth … that's why I needed the number." When Ray Ray told Major that he didn't ask for the woman's phone number because "she got scared and I [Ray Ray] got scared," Major began laughing again.

Major then told Ray Ray that Menchaca had said that Major was buying an ounce of heroin per week, which he said was "bullshit" and was why he needed to speak to Lobb. Ray Ray replied that Lobb had told him that she could not talk to Major. Major then said that he did not want Ray Ray to scare her and that he needed to "clean it up." Major told him to "get on it today." A few minutes later, Major called Ray Ray back and told him that he didn't need anybody saying, "These people came up here and blew on me[,] so you got to calm a mother fucker down today." Major said that he was upset because Menchaca had lied about the amount of drugs they had dealt and that he needed Lobb to tell the truth that it was a lesser amount than what Menchaca had claimed. Major gave Ray Ray the phone number for Burger King and told him he

needed to go up there that day. He said it would "help him out a lot" if Lobb said they never went up there (presumably Chicago) for ounces and "that's the truth." He later clarified that Lobb's testimony to this effect would undermine the credibility of Menchaca's statements during sentencing.

### C. Major's Sentencing

The Probation Office filed its final, revised PSR on September 10, 2020, a few days before sentencing. In addition to recounting the above facts (including Major's phone calls from jail), the PSR calculated a Sentencing Guidelines range based on Major's offenses, related conduct, and criminal history.

It calculated his base offense level for the conspiracy charge to be 24. Because he was "an organizer, leader, manager, or supervisor" in the conspiracy, two levels were added. *See* U.S.S.G. § 3B1.1(c). Two more levels were added for obstruction of justice, based on Major's phone calls from jail and Ray Ray's approaching Lobb at work. *See* U.S.S.G. § 3C1.1. This brought his adjusted offense level to 28. His total offense level was increased to 32, however, because he qualified as a "career offender" under U.S.S.G. § 4B1.1 (he had a previous felony drug conviction and a conviction for aggravated kidnapping). The PSR stated that a reduction for acceptance of responsibility was inappropriate. Major's criminal history was calculated to be category III, but based on his qualification as a career offender, it was increased to category VI. An offense level of 32 and a criminal history category of VI resulted in a Guidelines imprisonment range of 210–262 months for each count. The statutory maximum for each of Major's offenses of conviction is 20 years, which altered the guideline imprisonment range to 210–240 months. The PSR stated that the probation officer had not identified any factors under 18

U.S.C. § 3553(a) that warranted a sentence outside of this range.

At the sentencing hearing, Major's counsel objected to certain factual findings in the PSR and argued that the career offender status overstated Major's criminal history because his predicate conviction for aggravated kidnapping was over twenty-five years old. As relevant to this appeal, the factual findings Major challenged were: (1) that Major was the supplier of the fentanyl-laced heroin that led to A.K.'s overdose death, (2) that Major had obstructed justice by attempting to influence Lobb's testimony, and (3) that Major had not accepted responsibility for his conduct. Notably, despite Major's recorded phone calls disputing Menchaca's account of the drug quantity at issue, Major withdrew his objection to the amount of heroin and fentanyl set forth in the final PSR—even though the Probation Office increased the calculated amount of fentanyl from .4 grams to 9.8 grams between the first and final PSR and the heroin assessment had not changed.

To make its rulings on Major's objections, the court heard testimony from the officer who responded to the scene after A.K.'s mother found her dead, Bukowski (the woman who bought drugs from Major and then resold some of them to A.K.), Lobb, and the officer who investigated Major's phone calls from jail. The testimony essentially conveyed the facts recounted above. Based on this testimony, the district court rejected all of Major's arguments.

The district court also heard a victim impact statement from A.K.'s mother and a statement from Major himself. A.K.'s mother addressed Major and stated:

> This is a loss that I will never recover from, pain that time does not heal or even ease. Every day I relive the experience of finding my daughter. I see her unseeing eyes. I feel the unnatural coldness of her body.

> I see mothers interacting with daughters, and I don't have that any longer. I see grandchildren that I will never have, milestones that will never be reached, dreams and plans unfulfilled, a life extinguished. And for this reason, I hope that the Court would see fit to give you the maximum sentence so that the likelihood of your participation in this act again would not happen.

Major began his statement by giving his condolences to A.K.'s mother, but quickly clarified, "I'm not even sure who's at fault, but I understand that me, being a heroin dealer, that you would look at me as being at fault here…. I know that my actions could possibly did [*sic*] play a role or possibly did, but I just want you to know that I do send my condolences to you and your family." Major then expressed his remorse to the court and stated that he only dealt drugs to feed his own addiction and to treat a medical condition that made it difficult for him to eat. Major then transitioned to minimizing his conduct. He described himself as "just a drug user who was getting high, to have some few friends to direct that high, and with their money I could get by with." He also stated, "I never meant to sell nobody no fentanyl. I can't believe that I'm honestly facing this much time when all I actually did was sell Dawn two dime, three dime bags of dope for $50. That's what my conspiracy really consists of. Your Honor, I sold a friend

a bag of dope for $50 on two different occasions." When the court clarified whether it was Major's position that he never knew the heroin he purchased and resold had fentanyl in it, Major responded, "I mean, no, I didn't. All I knew, I was getting heroin."

Before handing down Major's sentence, the court stated:

> I'm glad you made a statement, Mr. Major, because it confirms for me that I made the right decision on acceptance of responsibility … because clearly the evidence is otherwise…. And I can only say after listening to you, Mr. Major, that I'm more comfortable with the decision—I think I was right anyway, but I'm way more comfortable with the decision I made now about acceptance. And I guess the only thing I can say is if you spend a lifetime of being untruthful, that you—there comes a point where you don't even know where the truth would help you, okay?

Given that Major had pushed fentanyl-laced heroin onto the streets of the community, deposited large sums of money in connection with his crimes, was a leader in the conspiracy, had a history of violence, played a part in the overdose death of A.K., and attempted to obstruct justice, the court decided that the statutory maximum sentence of twenty years' imprisonment was appropriate.

Major now appeals this sentence.

## II.    Discussion

Major challenges his sentence on four grounds. Namely, he argues: (1) the court erred by finding that he sold the drugs that caused A.K.'s death, (2) the court erred by finding that he had obstructed justice, (3) the court erred by finding he had not accepted responsibility, and (4) the court abused its discretion by sentencing him as a career offender because that label overstated the seriousness of his criminal history.

We use a two-step process to review a district court's sentencing decisions. "First, we determine whether the district court committed any procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *United States v. Faulkner*, 885 F.3d 488, 498 (7th Cir. 2018) (internal quotation marks omitted) (quoting *United States v. Reyes-Hernandez*, 624 F.3d 405, 409 (7th Cir. 2010)). "Whether the district court followed proper sentencing procedure is a legal question reviewed de novo." *United States v. Pape*, 601 F.3d 743, 746 (7th Cir. 2010). Although, as noted, it is a procedural error to select a sentence based on erroneous facts, *Faulkner*, 885 F.3d at 498, we review the district court's findings of fact underpinning the selected sentence only for clear error, *United States v. Ranjel*, 872 F.3d 815, 818 (7th Cir. 2017). Major's first three arguments challenge the factual findings underpinning the district court's sentence and thus fall under this first step.

Second, "[i]f no procedural error is found, then the sentence is reviewed for substantive reasonableness"; we review the substantive reasonableness of a sentence for abuse of discretion. *Faulkner*, 885 F.3d at 498. "A sentence is substantively reasonable 'if the district court gives meaningful consideration to the factors enumerated in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines, and arrives at a sentence that is objectively reasonable in light of the statutory factors and the individual circumstances of the case.'" *United States v. Patel*, 921 F.3d 663, 672 (7th Cir. 2019) (quoting *United States v. Rosen*, 726 F.3d 1017, 1027 (7th Cir. 2013)). "[W]e presume that a within-Guidelines sentence is reasonable." *Id*. Major's fourth and final argument—that the district court should have used its discretion to ignore Major's "career offender" designation—amounts to a challenge to the reasonableness of the court's sentencing decision.

**A.  The District Court's Factual Findings**

"Generally, facts considered at sentencing must be proved by a preponderance of the evidence." *United States v. Lucas*, 670 F.3d 784, 792 (7th Cir. 2012). Such facts must be based on "reliable evidence, rather than speculation or unfounded allegations." *Id.* "Evidence will satisfy this requirement if it bears sufficient indicia of reliability to support its probable accuracy." *Id.* (quoting *United States v. Santiago*, 495 F.3d 820, 824 (7th Cir. 2007)). Sentencing courts may also draw inferences and conclusions based on testimony given and evidence introduced at a sentencing hearing. *Id.*

"We will not disturb a sentencing court's factual findings unless they are clearly erroneous." *Ranjel*, 872 F.3d at 818. This standard is deferential, and "we will reverse only if 'after reviewing the entire record, we are left with the firm and

definite conviction that a mistake has been made.'" *Id.* (quoting *United States v. Marty*, 450 F.3d 687, 689–90 (7th Cir. 2006)). "If two possible conclusions can be drawn from the evidence, then the choice between them cannot be clearly erroneous." *United States v. May*, 748 F.3d 758, 760 (7th Cir. 2014).

### 1. Finding Regarding A.K.'s Overdose Death

First, Major argues that the district court clearly erred when it determined that he supplied the drugs that contributed to A.K.'s death. Significantly, the government did not seek a statutory enhancement to Major's sentence because he was not charged with the particular sale of drugs to Bukowski that Bukowski resold to A.K. *See* 21 U.S.C. § 841(b)(1)(C) (requiring a sentence of twenty years to life if "death or serious bodily injury results from the use of [the distributed] substance"); U.S.S.G. § 2D1.1(a)(2) (increasing the base offense level if "the offense *of conviction* establishes that death … resulted from the use of the substance"(emphasis added)).[1] Rather, the district court considered its finding about the relationship between Major and A.K.'s death when it weighed the sentencing factors set forth in 18 U.S.C. § 3553(a).

Major's argument on this point boils down to a contention that A.K. must have acquired more drugs from a different source after leaving Bukowski's home. Major seems to believe

---

[1] For this reason, the government did not have to prove that the heroin and fentanyl Major distributed was the "but-for" cause of A.K.'s death, under *Burrage v. United States*, 571 U.S. 204, 218–19 (2014). *See United States v. Lawler*, 818 F.3d 281, 285 (7th Cir. 2016) ("Nothing … prevents a sentencing court, when determining a defendant's ultimate sentence, from considering the fact that death resulted," even if the government cannot prove but-for causation beyond a reasonable doubt).

that, because A.K. did not overdose the first time she injected the drugs Bukowski provided, A.K. could not have subsequently overdosed if she injected the remainder of the drugs at home. But these inferences are not supported by the evidence submitted at the sentencing hearing. *Cf. Lucas*, 670 F.3d at 792 (noting that sentencing determinations cannot be based on "speculation or unfounded allegations").

Bukowski testified that A.K. was "really, really messed up" immediately after injecting the fentanyl-laced heroin that Bukowski had received from Major. In fact, Bukowski testified that she had shot up heroin with a number of people but had "never seen nobody act like that." A.K.'s behavior was strange enough that Bukowski contacted her boyfriend at the time to share her concern. Evidence also reflected that A.K. left Bukowski's apartment in an Uber around 7:30 PM and that she took the remaining drugs from Major with her when she left. Her mother told officers that A.K. arrived home, briefly greeted her, and then went to her room, where the mother found her unresponsive the next morning. Bukowski also testified that A.K. had asked her and her boyfriend for heroin because she was new in town, was concerned about soon experiencing withdrawal symptoms, and had no other means of acquiring the drugs. And, though A.K. left Bukowski's apartment with leftover heroin, no drugs were found in A.K.'s home. Finally, the autopsy report concluded that the toxic effects of heroin and fentanyl contributed to A.K.'s death. This evidence supports the district court's finding.

Furthermore, the district court specifically found that Bukowski was credible. "[W]here a sentencing challenge boils down to a credibility decision, … our review is especially deferential to the district judge's assessment of the testimony."

*United States v. Etchin*, 614 F.3d 726, 738 (7th Cir. 2010). And even though no corroboration is necessary for a court to accept witness testimony, *see id.* at 739, Bukowski's statements, the testimony of the investigating officer, the Uber receipts, and text messages from the time all corroborate each other. The district court's finding was not clearly erroneous, and this finding supported its weighing of the factors set forth in 18 U.S.C. § 3553(a).

### 2. *Obstruction of Justice Finding*

Second, Major challenges the district court's finding that he obstructed justice by attempting to influence Lobb's testimony.[2] An offense-level enhancement for obstruction of justice is appropriate if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the

---

[2] Although obstruction of justice typically increases a defendant's offense level under the Guidelines by two points, U.S.S.G. § 3C1.1, which would have brought Major's offense level up to a 28, Major's qualification as a "career offender" independently established a higher offense level of 32, making this finding irrelevant for the purpose of *increasing* his offense level, U.S.S.G. § 4B1.1(b)(3). This would ordinarily moot his challenge to the obstruction-of-justice finding. *See United States v. Collins*, 352 F. App'x 96, 98 (7th Cir. 2009) (noting that where the defendant was sentenced based on the higher offense level associated with a career offender designation, any challenge to a separate offense level adjustment would be moot). The district court, however, also considered Major's acts of obstruction when it determined that he did not adequately accept responsibility for his conduct, and an acceptance-of-responsibility finding would have *decreased* Major's offense level after accounting for the career offender designation. Thus, his challenge to this factual finding is not moot.

investigation, prosecution, or sentencing of the
instant offense of conviction, and (2) the ob-
structive conduct related to (A) the defendant's
offense of conviction and any relevant conduct;
or (B) a closely related offense ….

U.S.S.G. § 3C1.1. The commentary accompanying U.S.S.G.
§ 3C1.1 gives several examples of "the types of conduct to
which this adjustment applies," including "threatening, in-
timidating, or otherwise unlawfully influencing a co-defend-
ant, … or attempting to do so[.]" *Id.* cmt. 4(A). The intimida-
tion of a co-defendant can be separate from "committing, sub-
orning, or attempting to suborn perjury." *Id.* cmt. 4(B).

Major protests that there was no "evidence that [he] had
ever threatened Lobb or … attempted to have her commit per-
jury." He contends that he was simply trying to encourage
Lobb to tell the truth. Although he made some statements to
that effect during some of his phone calls, Major also knew
that those calls were being recorded—which he admitted dur-
ing his allocution, when he told the district court, "I know the
phones are recorded in jail." Given this knowledge, it is un-
surprising and less than persuasive that—in court—Major de-
scribed his motive as merely encouraging Lobb to "tell the
truth." Additionally, this assertion is undermined by the fact
that Major did not even object to the drug quantity set forth
in the PSR—the very issue on which he hoped Lobb would
contradict Menchaca.

Moreover, even if Major did simply want Lobb to "tell the
truth," this does not mean the district court clearly erred
when it held that Major's attempts to pressure Lobb to "un-
dermine the credibility of Menchaca" were a "clear example[]
of trying to influence the testimony of a witness," which

constituted obstruction. We considered such a scenario in *United States v. Cheek*, 740 F.3d 440 (7th Cir. 2014). In that case, the defendant wrote a letter to the daughter of a witness against him. *Id.* at 453–54. In the letter, the defendant told the daughter that her mother (the witness) was lying to the government, and he implied that the daughter should influence her mother to "tell the truth." *Id.* at 453. The defendant wrote:

> To prove [the charge] why would they need your Mom to lie on me if they had something?… She couldn't get more than 5 if she would've just plead guilty without lying on me.… The most she can get is 5 and me LIFE if she doesn't tell the truth.… So I am praying that she don't let them keep scaring her.… If God is willing you know who won't tell that lie and I will be there to see yall in the near future.

*Id.* at 444 (errors in original). We held that the "district court reasonably interpreted this effort as a willful attempt to persuade [the witness's] daughter to try to sway her mother's testimony." *Id.* at 454. "And an effort to influence a witness's testimony—albeit vicariously—is a prototypical example of obstruction of justice." *Id.* (citing U.S.S.G. § 3C1.1 cmt. 4(A)).

Following the reasoning in *Cheek*, even if Major was trying to urge Lobb to "tell the truth" from his point of view, such conduct may still constitute obstruction of justice if its purpose is to persuade a witness or co-defendant to alter her testimony. Here, the evidence clearly showed that Major made a frenzy of phone calls to various associates and family members in an attempt to affect Lobb's testimony about the quantity of drugs at issue. The context around these calls—in particular, the fact that Major asked his enforcer Ray Ray to get

involved, the fact that Major was intentionally vague on the recorded phone line about what he wanted his associates to do, and the fact that Major and Ray Ray laughed about how Lobb was "scared as hell"—was sufficient for the court to conclude that this attempt to influence Lobb's testimony was unlawful.

Thus, the district court did not err in finding that Major attempted to influence his co-defendant's testimony, and this factual finding supported its determination—discussed further below—that Major obstructed justice in a way that was incompatible with accepting responsibility for his conduct.

### 3. *Acceptance of Responsibility Finding*

Major next challenges the district court's finding that he had not accepted responsibility for his conduct and therefore was not entitled to a reduction in his offense level under the Guidelines. The Guidelines state that a two-level reduction is appropriate if "the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The defendant bears the burden of proving his acceptance of responsibility by a preponderance of the evidence. *United States v. Lister*, 432 F.3d 754, 759 (7th Cir. 2005). "We review the district court's decision on this fact-based finding for clear error." *Id.* In doing so, we accord "[g]reat deference" to the sentencing court, which is better equipped to "assess whether a particular defendant is motivated by genuine acceptance of responsibility or by a self-serving desire to minimize his own punishment." *United States v. Cunningham*, 103 F.3d 596, 598 (7th Cir. 1996) (citation and internal quotation marks omitted).

When making this finding, "the sentencing judge is required to look beyond formalistic expressions of culpability and to determine whether the defendant has manifested an acceptance of personal responsibility for his offense in a moral sense." *Id.* (citation omitted). For this reason, simply pleading guilty does not entitle a defendant to a reduction for acceptance of responsibility. *United States v. Sellers*, 595 F.3d 791, 793 (7th Cir. 2010). "A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true" generally will not qualify for the reduction. *See* U.S.S.G. § 3E1.1 cmt. 1(A). "Attempt[ing] to minimize [one's] level of involvement in an offense" is sufficient to deny a reduction for acceptance of responsibility, even when the defendant has pleaded guilty. *United States v. Munoz*, 610 F.3d 989, 993 (7th Cir. 2010).

Once again, plenty of evidence supported the district court's factual finding. First, "[c]onduct resulting in an [obstruction-of-justice] enhancement … ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1 cmt. 4. It is only in "extraordinary cases" that a defendant may receive an enhancement for obstruction of justice and also receive a reduction for acceptance of responsibility. *Id.* It was not clearly erroneous for the district court to conclude that this was not such an extraordinary case.

Moreover, Major objected to the presentence report's conclusion that he sold the drugs that led to A.K.'s death, which was a fact the court found to be both true and relevant. *See* U.S.S.G. § 1B1.3 (defining "relevant conduct" for sentencing purposes to include "harm that resulted from" acts that were "part of the same course of conduct … as the offense of

conviction"). On appeal, Major argues that his counsel—not Major—contested whether heroin and fentanyl he sold contributed to A.K.'s death. In support, he cites *United States v. Purchess*, in which we held that "where the defendant remains … silent as to relevant conduct but his lawyer challenges certain facts alleged in the PSR," then the district court "should attempt to ensure that the defendant understands and approves the argument before attributing the factual challenges in the argument to the defendant for purposes of assessing acceptance of responsibility." 107 F.3d 1261, 1268 (7th Cir. 1997); *see also Munoz*, 610 F.3d at 994 (distinguishing between factual challenges, which will jeopardize an acceptance-of-responsibility reduction, and legal arguments regarding undisputed facts, which will not).

But *Purchess* is not relevant here, because Major personally disputed whether his drugs caused A.K.'s death in his allocution at sentencing. For example, Major told A.K.'s mother, "I'm not even sure who's at fault [for A.K.'s death], but I understand that me, being a heroin dealer, that you would look at me as being at fault here." When the district court asked directly whether Major was admitting to selling Bukowski the heroin and fentanyl that she resold to A.K., Major responded, "Sir, by what's being said here today, I really don't know because, you know, I, I—first, I really didn't believe that I didn't [*sic*] sell them bags to [Bukowski] because I know what took place that particular day…. I'm just saying I don't know, and I don't believe the State [*sic*] proved to know it either. But it's a possibility that she did get them from me." It is clear from this exchange that Major himself contested this factual finding.

This, combined with the obstruction of justice finding, was more than sufficient for the court to conclude that Major had not accepted responsibility for his conduct. But any lingering doubt is erased by other statements Major made during his allocution. For instance, Major attempted to minimize his conduct, telling the district court, "I never meant to sell nobody no fentanyl. I can't believe that I'm honestly facing this much time when all I actually did was sell [Bukowski] two dime, three dime bags of dope for $50. That's what my conspiracy really consists of. Your Honor, I sold a friend a bag of dope for $50 on two different occasions." He also doubled down on his claim that he did not know that the heroin he sold contained fentanyl—despite his admissions to the contrary in text messages (referring to "that fintnal") and under oath at his change-of-plea hearing. When directly asked by the district court at sentencing, "So, you had no idea fentanyl was in them?" Major replied, "I mean, no, I didn't." Immediately after this exchange, the district court concluded, "I'm glad you made a statement, Mr. Major, because it confirms for me that I made the right decision on acceptance of responsibility…."

Ample evidence supported the district court's conclusion that Major had not accepted responsibility for his conduct by the time he was sentenced; this finding was not clearly erroneous.

## B. The Substantive Reasonableness of Major's Sentence

Finally, Major argues that his sentence was substantively unreasonable because—even though he technically qualifies as a career offender under the Sentencing Guidelines—that label overstates his criminal history. In essence, Major argues that the district court abused its discretion when it did not ignore the career offender enhancement when it sentenced him.

A defendant is classified as a career offender if:

> (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a). Such a designation sets the defendant's criminal history category to Category VI, and when the offense of conviction's statutory maximum sentence is between twenty and twenty-five years (as is the case for Major), the designation sets the offense level to 32. *See id.* § 4B1.1(b)(3). For Major, this resulted in a Guidelines range of 210–262 months' imprisonment, which was adjusted to 210–240 due to the statutory maximum of twenty years' imprisonment for his convictions.[3] The district court sentenced Major to 240 months' incarceration.

As we have noted, Major was convicted of two prior offenses that qualify him for the career offender designation: a previous felony drug conviction and a conviction for aggravated kidnapping. Major does not challenge these facts. But, he complains, he was convicted of aggravated kidnapping in 1993, over twenty-five years prior to his sentencing in this case. He also argues that the nature of that crime is unrelated

---

[3] Without the career offender designation, Major's offense level would have been 28, his criminal history would have been Category III, and his Guidelines range would have been 97–121 months' imprisonment. *See* U.S.S.G. Ch. 5, Pt. A.

to the instant conviction and that the aggravated kidnapping conviction has "no bearing" on his propensity to commit other offenses similar to the drug distribution charges at issue in this case.

For support, Major points to a Sentencing Guidelines policy statement, which says that "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. § 4A1.3(b)(1). Although the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), rendered the departure provisions "obsolete," "district courts can still take guidance from the departure provisions" and consider them "when assessing the § 3553(a) factors." *United States v. Bell*, 887 F.3d 795, 798 (7th Cir. 2018) (citation and internal quotation marks omitted).

Notwithstanding Major's arguments, the district court handed down a sentence squarely within the concededly applicable career-offender Guidelines range. Such sentences are presumed to be reasonable on appeal. *See Rita v. United States*, 551 U.S. 338, 347 (2007). Moreover, in "reviewing sentences for substantive reasonableness, we do not substitute our judgment for that of a district judge, who is better situated to make individualized sentencing decisions." *United States v. Porraz*, 943 F.3d 1099, 1104 (7th Cir. 2019). In fact, we will "uphold a sentence so long as the judge offers an adequate statement of his reasons consistent with the sentencing factors enumerated in 18 U.S.C. § 3553(a)." *Id.*

Here, the district court did just that. It thoroughly explained the reasons for its sentence, citing in particular the

following facts: Major's prior conviction for aggravated kidnapping, his previous drug distribution conviction, the fact that he "went right back to dealing drugs" after serving a fourteen-year sentence for his drug conviction, his decision to deal in the particularly dangerous combination of heroin laced with fentanyl, his leadership role in the conspiracy, the need to protect others from him, his attempt to obstruct justice, his minimization of his own wrongdoing, and his role in the unfortunate death of A.K. Given these facts, the court did not abuse its discretion by sentencing Major as a career offender and imposing a Guidelines sentence of 240 months in prison.

### III.    Conclusion

For the foregoing reasons, the decision of the district court is AFFIRMED.