In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 23-1236

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KEENAN SEYMOUR,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 17-cr-00138 — **Philip P. Simon**, *Judge.*

———————

ARGUED JANUARY 17, 2024 — DECIDED MARCH 5, 2024

———————

Before FLAUM, EASTERBROOK, and PRYOR, *Circuit Judges.*

FLAUM, *Circuit Judge*. Keenan Seymour pleaded guilty to a
Racketeer Influenced and Corrupt Organizations Act (RICO)
conspiracy charge stemming from his involvement in the
street gang, Latin Dragon Nation (the Dragons). Seymour was
sentenced to 180 months' imprisonment, below the Sentencing Guidelines' recommendation. He now seeks re-sentencing on three grounds, arguing that the district court erred
when (1) making certain factual findings, (2) holding him

accountable for murder, and (3) failing to discuss unwarranted sentencing disparities. Finding no error, we affirm.

## I.    Background

### A.  Factual Background

In 2017, Keenan Seymour joined the Dragons, a street gang in Northwest Indiana and Southeast Chicago. That year was a violent one, marked by conflict between the Dragons and one of their rival gangs, the Latin Kings (the Kings). In the summer of 2017, Seymour's childhood friend and fellow Dragon, Anthony Anaya (Anthony), was killed in retaliation for the murder of a prominent King. They had grown up together, along with Anthony's brother Justin Anaya (Anaya), Alec Aguilar, and DeAndre McGowan, referring to themselves as the "Reckless Boyz." The Anaya brothers, Aguilar, and Seymour later joined the Dragons.

In the aftermath of Anthony's murder, Seymour was sad and angry. He posted tributes to Anthony on social media and referenced getting payback. Anaya was also upset and looking to retaliate.

At around 1:00 AM on November 24, 2017, Seymour agreed to drive around with Anaya, Aguilar, and McGowan. While Aguilar drove, Anaya sat in the passenger seat, and Seymour and McGowan were in the back. For approximately six hours, the four drove around, drank, smoked marijuana, took Xanax, and made videos "[d]ropping … gang signs."

As the sun was coming up, they stopped at Anaya's house and he went inside, retrieving a gun. They continued driving and around 10:00 AM spotted a Pontiac Grand Prix that Anaya believed belonged to a King. The group pulled alongside the

Grand Prix, flashed gang signs, and eventually chased the car when it tried to flee. After a few blocks, Anaya leaned out of the window and shot at the Grand Prix, killing Manuel Salazar. Anaya was mistaken; Salazar was not a gang member. After the shooting, the four dropped the gun back at Anaya's house and then visited Anthony's grave.

### B. Procedural Background

In 2019, a federal grand jury indicted Seymour and several other Dragons on RICO conspiracy charges. Three years later, Seymour pleaded guilty without a plea agreement. As part of his plea, Seymour admitted to being a Dragon and supporting the gang in various ways, including by participating in acts of violence. He further admitted that he was in the car when Anaya killed Salazar but maintained that Anaya started shooting "without [his] prior knowledge or awareness."

Nonetheless, the probation officer's pre-sentence investigation report (PSR) concluded that Seymour was responsible for Salazar's murder, constituting a predicate act supporting the RICO charge. Consequently, the offense level under the Guidelines jumped to 43. Seymour objected to the PSR, arguing in-line with his plea declaration that he was not culpable for Salazar's death and thus the base offense level should be 19.

The district court held an evidentiary hearing to resolve the dispute. The evidence presented included videos and social media posts showing Seymour flashing gang signs, holding guns, and discussing Anthony's murder. Additionally, the district court heard live testimony from FBI agent Jacob Kerwin, Aguilar, McGowan, and Seymour about Salazar's murder.

Aguilar testified that as they were driving through King territory, Anaya suggested getting a gun to shoot at some Kings "for Solo," referring to Anthony. According to Aguilar, this conversation was loud enough for Seymour and McGowan (who were high and drunk in the backseat) to hear. Aguilar also testified that after Anaya retrieved the gun, it was visible to Seymour. Although the group did not explicitly discuss shooting Kings, there was "an understanding" that they would watch out for rival gang members to shoot. Aguilar testified that when they pulled up to the Grand Prix, he, Anaya, and Seymour started flashing gang signs, believing the car belonged to a King. Aguilar then chased the Grand Prix until Anaya started shooting. Aguilar viewed the shooting as retaliation for Anthony's death, prompting the group to visit Anthony's grave after.

McGowan also testified. Sitting in the backseat with Seymour, he did not overhear Aguilar and Anaya discuss getting a gun. But McGowan testified that after Anaya retrieved the gun, he held it up for everyone to see and Seymour responded, "[l]et me see that mother fucker," referring to the gun. McGowan also recalled Seymour suggesting a specific block in King territory to drive down, saying, "Go through J, they [referring to Kings] probably out on … Avenue J." Right before the shooting, Anaya told Aguilar, "Slow the car down, I'm gonna do my thing." Seymour then instructed McGowan to lean back so that they would not be visible. McGowan testified that after the shooting Seymor "was smirking and laughing and shaking up [the Dragon's handshake] with" Aguilar.

When Seymour testified at the evidentiary hearing, he denied overhearing any conversation about getting the gun,

knowing that Anaya had a gun, or knowing that they were searching for Kings to shoot. According to Seymour, they were "[j]ust riding around, drinking, smoking," and listening to loud music. He thought that they might get in a fight if they saw a King. Seymour admitted to flashing gang signs at the Grand Prix to "confront the suspected Latin King," but maintained that he did not see the gun until Anaya "started hanging out the window shooting."

On cross-examination, the government confronted Seymour with statements that he made to police in a recorded interview less than a week after the shooting.[1] In that interview, Seymour admitted that by 8:00 or 9:00 AM he had seen the gun on Anaya's lap. Seymour also told police that while he did not intend to shoot anyone, after he saw Anaya's gun he "knew what was going on."

Seymour recounted that after he saw the gun, they went to a suspected King neighborhood and drove around for an hour or two, looking for some Kings to "beat or shoot." At one point Seymour considered leaving but decided that he might as well "ride around" and "see what we get into." He told police that they eventually pulled up next to the Grand Prix at a red light and flashed gang signs because Aguilar and Anaya suspected that the Grand Prix's passenger was a King. They chased the car until Anaya leaned out and started shooting, shattering the back window of the Grand Prix. Seymour said that during the chase he was "ready for whatever." When

---

[1] The district court suppressed the interview for trial purposes because of a *Miranda* violation. Seymour did not challenge the admission of his recorded statement for sentencing purposes, nor could he since the exclusionary rule does not apply at sentencing. *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1388 (7th Cir. 1994).

asked about these admissions during the evidentiary hearing, including his admission that he knew Anaya had the gun before the shooting, Seymour merely acknowledged making those statements to police.

In a subsequent opinion and order, the district court found multiple bases to treat Salazar's murder as the "underlying racketeering activity" for the purposes of calculating Seymour's sentence under the Guidelines. In doing so, it made several findings of fact, including that Seymour knew the Dragons's rules, gang signs, and that Dragons "often shot at persons suspected or known to be members of rival gangs, with the intent of killing them, particularly as acts of retaliation." The district court also found, by a preponderance of the evidence, that all the car's occupants, including Seymour, "were aware that Anaya had brought a gun into the car and proposed that they set out to find some Latin Kings to shoot at." Furthermore, the district court determined that "Seymour offered a suggestion about a street that might be fruitful" for that purpose. Given these findings, the district court concluded that Seymour's claims of ignorance were unpersuasive.

With an "underlying racketeering activity" of first-degree murder, the district court calculated Seymour's offense level as 43. This resulted in a Guidelines recommendation limited by the statutory maximum of 240 months' imprisonment. At sentencing, Seymour requested 60 months. A 60-month sentence, he argued, would avoid unwarranted sentencing disparities with some of his co-defendants. The district court sentenced Seymour to 180 months' imprisonment. Seymour timely appealed.

## II.    Discussion

Seymour makes three challenges to his sentence. We review each in turn.

### A.  District Court's Factual Findings

Seymour challenges two of the district court's factual findings: (1) that he knew Anaya had a gun and (2) that he knew Anaya had proposed finding Kings to shoot. "[F]acts considered at sentencing must be prove[n] by a preponderance of the evidence" and "based on reliable evidence, rather than speculation or unfounded allegations." *United States v. Major*, 33 F.4th 370, 379 (7th Cir. 2022) (citation and internal quotation marks omitted), *cert. denied*, 143 S. Ct. 259.

We do not "disturb a sentencing court's factual findings unless they are clearly erroneous." *Id.* (quoting *United States v. Ranjel*, 872 F.3d 815, 818 (7th Cir. 2017)). Seymour faces "a steep hill to climb." *Ranjel*, 872 F.3d at 818. We will only reverse if, "after considering all of the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made." *United States v. Dickerson*, 42 F.4th 799, 804 (7th Cir. 2022) (citation and internal quotation marks omitted). "If two possible conclusions can be drawn from the evidence, then the choice between them cannot be clearly erroneous." *Major*, 33 F.4th at 379 (quoting *United States v. May*, 748 F.3d 758, 760 (7th Cir. 2014)).

The court did not clearly err when making either factual finding. Instead, the record reveals ample support for both. In his recorded interview, taken less than a week after the shooting, Seymour admitted that (1) he knew Anaya had a gun in the car before the shooting, (2) they were driving around looking for Kings to "beat or shoot," and (3) once he saw the gun,

he "knew what was going on." Aguilar and McGowan's testimony corroborated those admissions. Aguilar testified that he and Anaya loudly discussed getting a gun, and that the gun was visible to Seymour. McGowan similarly testified that Seymour saw the gun before the shooting began.

Rather than challenging the sufficiency of the evidence underpinning the court's factual findings, Seymour takes issue with the district court's credibility determinations. "[W]here a sentencing challenge boils down to a credibility decision, … our review is especially deferential to the district judge's assessment of the testimony." *Id.* at 380 (alteration and omission in original) (quoting *United States v. Etchin*, 614 F.3d 726, 738 (7th Cir. 2010)).

Seymour argues that the district court erred by finding some of Aguilar and McGowan's testimony credible, but not all. This is a nonstarter. "[T]he district court may credit all *or part* of a witness's testimony, especially when there is more than one permissible reading of the evidence." *United States v. Vaccaro*, 915 F.3d 431, 435 (7th Cir. 2019) (emphasis added). Moreover, Seymour ignores that the district court credited the portions of Aguilar and McGowan's testimony that were consistent with his statements to police within days of the shooting. Seymour may have told a different story during the evidentiary hearing, but that does not make the district court's assessment of the evidence clearly erroneous.[2]

---

[2] Seymour also complains that the district court did not identify the specific witness testimony it relied upon in making its findings. But, as we have explained, "it is of no consequence that the district court did not expressly refer to particular witnesses' testimony in making the finding." *United States v. Testa*, 33 F.3d 747, 753 (7th Cir. 1994).

### B. Accountability for Salazar's Death

Next, Seymour argues that the district court erred in calculating his offense level when it attributed Salazar's death to him. The base offense level for a RICO conspiracy—Seymour's crime—is either 19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1. The district court concluded that the "underlying racketeering activity" was first-degree murder, which has a corresponding offense level of 43. The district court concluded that Salazar's murder was attributable to Seymour because it was a jointly undertaken criminal activity, he aided and abetted the shooting, and he was directly responsible under Illinois law.

"We review de novo a judge's application and computation of a defendant's Sentencing Guidelines range." *United States v. Porraz*, 943 F.3d 1099, 1102 (7th Cir. 2019). However, we review the "factual determinations underlying the application of the Guidelines," such as the determination that Seymour is responsible for murder, for clear error. *Id.* at 1102–03; *United States v. Schrode*, 839 F.3d 545, 550 (7th Cir. 2016) (explaining that "[r]elevant conduct determinations are factual determinations, which may only be reversed for clear error").

The Guidelines hold defendants accountable for jointly undertaken conduct that is "(i) within the scope of[,] … (ii) in furtherance of[,] … and (iii) reasonably foreseeable in connection with" "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others." U.S.S.G. § 1B1.3(a)(1)(B). Seymour challenges only foreseeability. He argues that Salazar's murder was not reasonably foreseeable to him because the Reckless Boyz had, for years, driven around, drinking and smoking, without shooting at anyone.

On that basis, Seymour asserts that he had no idea Anaya had a gun or would pull the trigger.

This argument is a repackaged attempt to challenge the district court's factual findings. But as already explained, the district court's factual findings were not clearly erroneous. They were supported not only by the testimony of Seymour's co-defendants, but also by Seymour's own admissions to the police. That is more than enough to support the district court's conclusion that the murder was reasonably foreseeable.

Stepping back, "[w]e have emphasized that murder can be a reasonably foreseeable result of a defendant's gang activities even if he did not kill anyone or otherwise personally participate in a murder." *Porraz*, 943 F.3d at 1103. Often, we have applied this principle to gang leaders, holding them accountable for murders committed by other members because "[m]urder was … a foreseeable part of [defendant's] agreement with gang members." *Id.*; *see also United States v. Garcia*, 754 F.3d 460, 484–85 (7th Cir. 2014) (concluding that murder was reasonably foreseeable to an Inca—a leader of a section of the gang—because he knew the rules of the gang, including to shoot rival gang members, and protected his territory); *United States v. Hernandez*, 37 F.4th 1316, 1320–21 (7th Cir. 2022) (holding an Inca accountable for murder because he knew the gang's rules, offered a rifle to other gang members for security, and previously shot at rival gang members). In those cases, we have emphasized that the defendant was an active participant in the gang and responsible, per gang rules, for safeguarding territory by shooting at rival gangs. *Porraz*, 943 F.3d at 1103.

Seymour was not a gang leader, nor responsible for safeguarding gang territory, but Salazar's murder was nonetheless foreseeable. Neither our case law nor the Guidelines limit jointly undertaken criminal activity to gang leaders. *See United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003) (explaining that even if a defendant was a fringe member of the conspiracy, so long as he participated in it and the violent acts were reasonably foreseeable to him, the murder committed by a co-conspirator could be attributed to him); U.S.S.G. § 1B1.3, cmt. n.4(C)(vi) (explaining that a street-level drug dealer that pools resources and profits with other street-level dealers is accountable for the drug quantities sold by the other dealers). More importantly, Seymour, an active gang participant with knowledge of the gang's rules, knew that Anaya had a gun and furthered Anaya's known aims by suggesting where to find Kings—on Avenue J. As a result, the district court did not clearly err by finding Salazar's murder reasonably foreseeable, nor did it clearly err by attributing Salazar's murder to Seymour as jointly undertaken criminal activity.

Because aiding and abetting liability and direct responsibility are alternative bases for holding Seymour responsible for Salazar's murder, we need not reach them. *See United States v. Burnett*, 37 F.4th 1235, 1240 (7th Cir. 2022); U.S.S.G. § 1B1.3, cmt. n.2.

### C. Unwarranted Sentencing Disparities

Last, Seymour argues that the district court failed to avoid unwarranted sentencing disparities among co-defendants by imposing a 180-month sentence. Whether conceived as a procedural or substantive challenge, Seymour's claim fails.

"We review whether a district court procedurally erred during sentencing *de novo*." *United States v. Gill*, 889 F.3d 373, 377 (7th Cir. 2018). "A district court might commit procedural error if it fails to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* (citation and internal quotation marks omitted); 18 U.S.C. § 3553(a)(6). However, "if a district court imposes a within-Guideline range sentence, the court implicitly incorporates the United States Sentencing Commission's concerns regarding avoiding unwarranted disparities among similarly situated defendants." *United States v. Prado*, 743 F.3d 248, 252 (7th Cir. 2014).

The district court's correct calculation of the Sentencing Guidelines' range and imposition of a below-Guidelines sentence means that it necessarily considered the need to avoid unwarranted disparities. *See United States v. King*, 910 F.3d 320, 330 (7th Cir. 2018) ("Because … the sentencing guidelines derive from national patterns, we have … held that a properly calculated guidelines recommendation necessarily considers the consistency between similarly situated defendants." (citation and internal quotation marks omitted)); *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017) ("[T]he Sentencing Guidelines are themselves an anti-disparity formula.").

In any event, the district court addressed Seymour's argument that two codefendants' (Angelina Vilella and Tiffany Barragan) 60-month sentences warranted a downward departure. The district court explained that there was "no comparison" between Seymour's conduct and that of Vilella and Barragan. More importantly, the district court noted that Vilella and Barragan entered into negotiated plea agreements stipulating 60-month sentences. Seymour, in contrast, gave the

district court the ultimate discretion to consider and weigh all § 3553(a) factors. To the extent Vilella and Barragan's sentences created a disparity, that was a result of prosecutorial discretion and not judicial error. *Cf. Gill*, 889 F.3d at 378 n.2 (recognizing that a prosecutor's choice to dismiss a sentencing enhancement for some defendants, but not others resulted in a disparity that "was created by the prosecutor, not the court.").

Finding no procedural error, we proceed to assess the substantive reasonableness of Seymour's sentence for abuse of discretion. *Porraz*, 943 F.3d at 1104. "[T]here is a nearly irrebuttable presumption that a below-[Guidelines] range sentence is reasonable." *United States v. Oregon*, 58 F.4th 298, 302 (7th Cir. 2023) (first alteration in original) (quoting *United States v. Miller*, 829 F.3d 519, 527 (7th Cir. 2016)). In fact, we have never held that a below-Guidelines sentence is unreasonably high. *Id.* "A defendant can only rebut this presumption of reasonableness by showing that the sentence does not comport with the factors outlined in 18 U.S.C. § 3553(a)." *United States v. De La Torre*, 940 F.3d 938, 953 (7th Cir. 2019) (citation and internal quotation marks omitted).

Seymour has not rebutted the presumption. The district court considered each of the § 3553(a) factors, including unwarranted disparities. Seymour's below-Guidelines, 180-month sentence is substantively reasonable.

### III.    Conclusion

For the reasons explained, the judgment of the district court is AFFIRMED.